UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| Eric C. Grimm, | |
| Plaintiff, | |
| vs. | Civil Action No. 17-cv-654 |
| Raw Story Media, Inc., The Washington Times, LLC, The Herald Publishing Company, LLC, MLive Media Group, f/k/a Booth Newspapers, Inc., Newslo, The Associated Press, Stephen Kloosterman, Kevin Even, Paul Shibley, Brianna Scott, David Bossenbroek, Matt J. Roberts, David Shafer, Barton Dieters, and Gregory C. Pittman, | Hon. _____ <br> United States District Judge |
| Defendants. | |

Eric C. Grimm (P58990)
ERIC C. GRIMM, PLLC
1017 West South Street
Alvin, TX  77511
Main: (734) 717-4900
Fax: (888) 502-1291
Email:  ecgrimm@umich.edu
Attorney for Plaintiff.

## ORIGINAL COMPLAINT AND JURY DEMAND

This is a complaint for defamation, for defamation *per se*, and for false light, by Eric C. Grimm, seeking compensatory damages from all defendants, and exemplary / punitive damages from most of the defendants (those offered a written retraction demand prior to filing).

## PARTIES

1.     Eric. C. Grimm is a natural person who resides in Texas, and who is a Texas resident

for federal subject-matter jurisdiction and complete diversity purposes.  Mr. Grimm has been a licensed attorney in Texas since 1993, and is licensed in other jurisdictions, too.  From 1993 to 1994, Eric Grimm served a fixed one-year term as a Briefing Attorney for the Texas Supreme Court.  From 1994-95, Eric Grimm served a fixed one-year term as a Law Clerk for the U.S. District Court for the Southern District of Texas, before taking a job with a law firm in Washington, D.C.  Grimm is an honors graduate of the University of Michigan Law School, and also graduated with honors from the University of Houston, in Houston Texas, where Mr. Grimm was a National Merit Scholar.

2.      Defendant Raw Story Media, Inc., is a non-Texas, incorporated, business entity with its principal place of business in Washington, D.C., and that is believed to be incorporated in California.  Indeed, as of July 17, 2017, Raw Story Media, Inc., according to the Texas Comptroller of Public Accounts, is in a forfeiture status and is not presently authorized to transact business in Texas.  It may be served with legal process at the following address:

> Raw Story, Inc.
> PO Box 21050
> Washington, D.C. 20009

3.      Defendant The Washington Times, LLC, is a non-Texas limited liability company headquartered in Washington, D.C..   It may be served with legal process using the following address:

> The Washington Times, LLC
> 3600 New York Avenue NE
> Washington, DC 20002

4.      Defendant The Herald Publishing Company, LLC, is a New York business entity that publishes newspapers in Michigan and in other places.  It has neither its headquarters nor its state of incorporation in Texas.  It may be served with legal process using the following address:

CSC-LAWYERS INCORPORATING SERVICE (COMPANY)
601 ABBOT ROAD
EAST LANSING   MI  48823

5.      On information and belief, Defendant MLive Media Group, f/k/a Booth Newspapers,

Inc., has no present corporate existence aside from Defendant the Herald Publishing Company, LLC.

Due to transacting business in Michigan using the name MLive Media Group, it is being included

as a Defendant in this manner, in an abundance of caution.  If and to the extent that this Defendant

has any continued existence as a Michigan business entity, then it may be served with legal process

via its printing plant in Walker, Michigan, at:

MLive Media Group
3102 Walker Ridge Dr., NW
Grand Rapids, MI 49544

6.      "Newslo" is what appears to be a now-defunct and discontinued "Fake News" and

misinformation operation, that continued to publish articles (and to propagate them far and wide via

a network of other "Fake News" or "Junk News" outlets – Politicops.com, Politicot.com,

Politicass.com and more), until shortly after the 2016 election.  On information and belief Newslo

was part of a sophisticated and highly-coordinated "Junk News" and "Bot" operation detailed in a

recent report by Oxford Internet Institute.  See Sam Woolley & Phil Howard, COMPUTATIONAL

PROPAGANDA WORLDWIDE: EXECUTIVE SUMMARY(Computational Propaganda Research Project

at  the  Oxford  Internet  Institute,  University  of  Oxford,  ed.  June  19,  2017),  <

comprop.oii.ox.ac.uk/wp-content/uploads/sites/89/2017/06/Casestudies-ExecutiveSummary.pdf>.

Further investigation and discovery is reasonably believed likely to reveal that other right-wing and

Republican-leaning news outlets in the United States, during the 2016 election cycle intentionally

manufactured  deceptive  misleading  and  defamatory  raw  material,  to  be  transformed  through

propagation over the Associated Press newswire, and then via one or more additional levels of distortion and obfuscation by Newslo and affiliated sites, into completely fabricated false and defamatory media reports that audiences (especially on social media) had profound difficulty distinguishing from normal press reports and routinely mistook for "straight" news reporting.  At the time of publication, and at present, the incorporation information, ownership, and place of business of Newslo and affiliated "Junk News" or "Fake News" propaganda-laundering enterprises, was deliberately obfuscated and hidden, thus making it difficult to ascertain where and how to serve those responsible with legal process – especially now that Newslo appears to have been shut down.

7.     Stephen Kloosterman is a natural person, who resides in Michigan.  Until recently, Mr. Kloosterman worked a reporter for MLive Media Group (in other words, on information and belief, for The Herald Publishing Company, LLC).  His new address for service of legal process has been timely requested from Mr. Kloosterman, but he has not yet responded.  On information and belief, legal process for Mr. Kloosterman can be directed to:

> Great American Media Services
> 75 Applewood Drive Suite A - PO Box 128
> Sparta Michigan 49345 U.S.A
> 616-887-9008

8.     The Associated Press is a multinational, incorporated, business entity headquartered in New York City, that may be served with legal process at:

> The Associated Press
> 200 Liberty St.
> New York, NY 10281.

9.     Kevin Even is a natural person, who in 2016 served as Chair of the Republican Party in Muskegon County.  He is a permanent resident of Fruitland Township, Muskegon County, Michigan.  Legal process may be served on him at:

Kevin B. Even
900 3rd St Ste 204,
Muskegon, MI 49440

10.     Paul Shibley is a natural person whose permanent residence is in Ottawa County,

Michigan.  Legal process may be served on him at:

Paul Shibley
Fielstra Shibley, P.C.
The Hines Building
380 W. Western Ave., Suite 250
Muskegon, MI 49440

11.     Brianna T. Scott is a natural person, whose permanent residence is in the City of

Norton Shores, Muskegon County, Michigan.  Legal process may be served on her at:

Brianna T. Scott
Brianna T Scott & Associates
75 W Apple Avenue
Muskegon, MI 49440

12.     David Bossenbroek is a natural person who, on information and belief, resides in

Muskegon County, Michigan.  Legal process may be served on Mr. Bossenbroek at:

David Bossenbroek
Britton & Bossenbroek
900 3rd St #301
Muskegon MI 49440

13.     David Shaffer is a natural person who, on information and belief, resides in

Muskegon County, Michigan.  Legal process may be served on Mr. Shafer, at:

David P Shafer
Nolan Nolan & Shafer PLC
40 Concord Avenue #1
Muskegon, MI 49442

14.     Matt J. Roberts is a natural person who resides in Muskegon County, Michigan, and

who may be served with legal process at:

Page -5-

> Matthew J. Roberts
> 990 Terrace Street; Fifth Floor
> Muskegon, MI 49440

15.     Barton Dieters is a natural person who on information and belief resides in Kent County, Michigan, and works as a television reporter for WOOD-TV in Grand Rapids.  Legal process may be served on him at:

> Barton Dieters
> WOOD-TV
> 120 College Ave SE
> Grand Rapids, MI 49503

16.     Gregory C. Pittman is a natural person residing in Muskegon Michigan.  Legal process may be served on him at:

> Gregory C. Pittman
> 990 Terrace Street
> Muskegon, MI 49440

## JURISDICTION AND VENUE

17.     Federal subject-matter jurisdiction exists because the named parties are completely diverse (Plaintiff is in Texas and none of the Defendants are), for purposes of 28 U.S.C. § 1332, and the amount in controversy exceeds $75,000.00, exclusive of interest or costs.

18.     The actual harm suffered by the plaintiff (setting aside the prayer for exemplary or punitive damages) exceeds the jurisdictional amount of $75,000.00 by at least an entire order of magnitude, not just several multiples.

19.     Venue is proper in the U.S. District Court for the Western District of Michigan because multiple defendants reside in Michigan, and most of the events leading up to this civil action, occurred in or near Grand Rapids.

## "AFRICAN GORILLAS CONTROL THE WHITE HOUSE"

## COUNT ONE – DEFAMATION

20.     Plaintiff repeats and realleges paragraphs 1-21 as if set forth herein verbatim.

21.     In late July, 2016, a matter of days before the August 2, 2016 primary for an open Judge of the Probate Court seat in Muskegon County, the Plaintiff, Eric Grimm, was shocked, devastated, and flabbergasted to learn – via complete strangers from as far away as Los Angeles and Atlanta, that the Newslo network of Junk News and Fake News websites, had started propagating a completely false and fraudulent story, falsely attributing to Eric Grimm statements that Eric Grimm did not even remotely say (and that were 180 degrees the opposite of his attitudes).

22.     These strangers (such as, but not limited to Rene Adenusi of Atlanta), actually believed that the Junk News story from Newslo and an octopus of "echo chamber" republication sites, was actually a fact-checked "hard news" story from a legitimate news outlet.  And boy, howdy, was Ms. Adenusi (and several other people like her) spitting mad.

23.     That is, until Eric Grimm took a half hour to talk to Ms. Adenusi on the telephone, and to make clear that he is an ally and an advocate of the issues she holds most dear.  And they have since become friendly and not antagonistic.  Mr. Grimm also took time right before voting occurred in the primary to talk to other upset people (who if they knew the real facts, would be at least neutral, and likely allies of Grimm) from around the United States via social media, telephone, and other means of interstate communication.

24.     The Newslo claims that were echoing unpredictably around social media, and *via* links to the Newslo octopus of "Junk News" Websites, falsely attributed to Eric Grimm (in the headline) the statement: "African Gorillas Control the White House."

25.     Eric Grimm has **never** said that or anything even remotely similar.

26.     The assertion in the Newslo headline is categorically and completely false.

27.     That is absolutely, 180 degrees the opposite of Eric Grimm's sensibility.

28.     Eric Grimm, from the time he relocated to Muskegon, Michigan, in or about 2008, to the time he moved to Texas in 2017, was actively involved in an number of initiatives to fight and combat racism in what – historically – has been the 19th most-segregated SMSA in the United States.

29.     Early on in Eric Grimm's time in Muskegon, Cindy Larsen, the President of the Muskegon Chamber of Commerce, asked Eric Grimm to be active in promoting race equality, anti-segregation, and non-discrimination issues.

30.     Aside from the positive reputation of Eric Grimm's late father (a district court judge in Muskegon County for over 30 years), especially in the African-American community, another strong reason that Eric Grimm was viewed far and wide as a key person to bridge a badly-divided community, was because it became quickly known that since prior to 2000, Eric Grimm had been in a stable, long-term committed relationship with a French woman who was African by birth (Cameroon), and this public awareness also helped put most people of European, Asian, Native American, and African (as well as mixed ancestry), at ease.

31.     Eric Grimm volunteered to knock doors and make telephone calls for Barack Obama in 2008, because Eric Grimm actively wanted Barack and Michelle Obama in the White House.

32.     Eric Grimm volunteered to knock doors and make telephone calls for Barack Obama in 2012, because Eric Grimm actively wanted to keep Barack and Michelle Obama in the White House.

33.     Eric Grimm, throughout the Obama Administration, was aghast by Republicans attempting to denigrate Mrs. Obama (at least as formidable a lawyer as her husband) because of the

way her shoulders looked, and other bizarre and incomprehensible "conservative" thought processes.

34.     Eric Grimm has repeatedly published on social media and via other outlets, statements praising the Obamas for the dignity and grace with which they both handled themselves in the White House.

35.     Aside from the defamatory headline, the ensuing article, which was routinely mistaken by people who encountered it as "real news," also falsely attributed to the Plaintiff a veritable firehose or smorgasbord of categorically false, misattributed, horrible racist opinions (1) that Plaintiff never has spoken; (2) that Plaintiff categorically rejects and never would express anything of the sort; and (3) that it was devastating and deeply upsetting to the Plaintiff to see such an upside-down, absolutely false and defamatory, set of fake and malicious factual allegations, directed at himself.

36.     The falsehoods in the headline were published with actual malice.

37.     The entire Newslo story was false and published with actual malice.

38.     The falsehoods were not only malicious, but specifically intended to cause catastrophic and outrageous harm to the Plaintiff.

39.     Plaintiff was harmed, as a direct and proximate result of the malicious Newslo falsehoods.

40.     Plaintiff suffered damages to his reputation (for falsely – **<u>categorically</u>** – falsely being mis-branded a "racist" and a "bigot" when Plaintiff s nothing of the sort, and a staunch opponent of racism) far in excess of the amount of $75,000.00, exclusive of interest and costs.

## <u>COUNT TWO – FALSE LIGHT</u>

41.     Plaintiff repeats and realleges paragraphs 1-41 as if set forth verbatim, herein.

42.     Newslo and its "feeder" newspapers cast the Plaintiff, and the Plaintiff's history of opposing racism, in a false light, via the carefully-crafted headline of the Newslo article.

43.     Newslo and its "feeder" newspapers cast the Plaintiff, and the Plaintiff's history of opposing racism, in a false light, via the carefully-crafted and entirely deceptive and misleading body of the Newslo "Junk News" article.

44.     These deliberate efforts to cast the Plaintiff and Plaintiff's longstanding opposition to racism in a false light, were willful and intentional, and calculated to cause devastating harm to Plaintiff's professional career.

45.     The Newslo article, the headline, and the entire contents of what Newslo published and propagated via an octopus of Websites and social media, were published with actual malice as to the truth or falsity of what was published.

46.     Neither Newslo, nor any of the feeder newspapers, made any reasonable effort to fact-check their stories, or to reflect the actual facts (Plaintiff is a firebrand **opponent** who sometimes upsets Republican racists by exposing their unhealthy attitudes), before casting Plaintiff in a false light with the deliberate intention of causing the Plaintiff devastating harm.

47.     Plaintiff suffered actual damages, including damages that Defendants intended to cause to Plaintiff's career and profession – as a direct and proximate result of the false light tort.

## THE NOLAN LAW FIRM

48.     The intentional deliberate and malicious chain of distortions and transformations that turned reality upside-down, and that were calculated to cause devastating and incalculable harm to the Plaintiff's profession and career, started with the Nolan law firm, and especially Defendant David Shafer.

49.     The Nolan Law firm is located in Muskegon, Michigan.  It was formed by two brothers in the 1980s – Terry Nolan and Mike Nolan.

50.     Neither of the firm's founders remains a member of said law firm.

51.     Mike Nolan went on to become a District Court Judge.  Indeed, Judge Nolan presided over two preliminary examinations (each of those prelims involving Gabriel Smith and Kirsten Grimm) referenced later in this Complaint.  He retired, recently, from the District Court bench.

52.     Terry Nolan's history in the Muskegon legal community has been reported-on extensively, and need not be rehashed here.

53.     Allegations as to whether Muskegon Michigan, and some current or former legal professionals in West Michigan have concealed ties to organized crime (including, without limitation, Russian organized crime), are not necessary or essential to this Complaint, and therefore Plaintiff merely reserves the right to take any and all discovery on this subject.

54.     Another brother of Mike and Terry, Patrick Nolan, moved to Muskegon some years subsequent to the Nolan firm's founding, to help manage the firm.

55.     Patrick's son, Geoff Nolan, after graduating from law school, took Geoff's first job as a lawyer, with his father's (Patrick's) law firm, right after Geoff graduated from law school.

56.     Between the time Geoff joined Patrick's law firm, and 2016, Geoff Nolan had little or no additional experience as a lawyer, beyond the work he did with Nolan, Nolan & Shafer (or Nolan & Nolan, before that).

57.     Another attorney who is not related to the Nolans, David Shafer, added his name to the law firm name in or about 2001.  Like Geoff Nolan, Mr. Shafer has little or no experience working as a lawyer (or as a legal professional) in any setting other than the Nolan law firm.

58.     By Mr. Shafer's own admission (delivered to Eric Grimm at a Case Evaluation setting recently, at which both Mr. Shafer and Mr. Grimm were panelists), upon graduating from law school in 1995 and jointing the Nolan firm (at a time while Terry was still one of the Nolans in Nolan & Nolan), Shafer "partied like a rockstar" for many years, and engaged in other excesses in behavior. Based on his demeanor that day, Mr. Shafer appears still to enjoy a somewhat inordinate sense of pride about holding a law license and yet still "party[ing] like a rockstar" in Muskegon County.

59.     Needless to say, real rockstars in Muskegon, are few and far between.

60.     Plaintiff has never aspired to "party like a rockstar," and views such a lifestyle choice as inconsistent with a lawyer's ethical responsibilities to the justice system and to clients.

61.     Plaintiff has a very high AVVO ranking, and numerous five-star reviews by actual clients on AVVO – especially compared with most Muskegon lawyers.

62.     Mr. Shafer, Patrick Nolan, and Geoff Nolan, do not share comparable rankings in terms of professional qualifications, similar academic background, even remotely comparable clerkship experience, or comparable uniformly positive client feedback from public client reviews.

63.     In the entire time from when the Plaintiff relocated to Muskegon (after more than 15 years of doing considerably more advanced work in other locales), to early 2017 (when Plaintiff relocated to Texas), Plaintiff had the Nolan firm as opposing counsel on at most three occasions (one of which was a five-minute appearance at a traffic hearing).  The Nolan firm, and its members, accordingly (and contrary to false statements by Shafer later reprinted by MLive), had almost no occasion to interact with the Plaintiff except at social events – which events still very rarely included both the Plaintiff and any member of the Nolan firm.

64.     The Nolans were perhaps sore, however, that Plaintiff had the whole Nolan firm

disqualified by Judge Ruck (and with good reason), from a representation adverse to Plaintiff's elderly mother (Martha Grimm), that involved the Nolan firm representing an individual adverse completely unrelated to Martha (Gabriel Smith – a longtime acquaintance of Shafer, who also had a history of questionable "party" habits), when Smith wanted to try to dissolve a personal protection order that had been taken out to stop Mr. Smith from continuing to demand money from Martha Grimm.  Mr. Smith was later charged with felonies against Martha Grimm.  Mr. Smith also pleaded "no contest" to, and served time for, at least one financial felony against Michael Grimm, another son of Martha.  Why the Nolan firm would ever undertake such a representation, to help a predator do evil to a vulnerable adult, in the first place, remains something of a mystery.

65.     The Nolans do not do municipal law, intellectual property, commercial law, valuation cases in the Tax Tribunal, employment law, or any of the other technical subjects that principally occupied Plaintiff's time, while Plaintiff was in Muskegon doing Plaintiff's level best to protect his elderly mom from financial harm at the hands of Shafer's acquaintance Mr. Smith, and other Muskegon predators.

66.     Accordingly, the Nolans have no reliable, or accurate, factual basis to attempt to offer any statement of fact (or even of opinion, for that matter) about the professional qualifications (or experience with contested court cases while working as a clerk for well-qualified judges) of the Plaintiff.

67.     It is a false light, and defamatory, for anyone in the Nolan firm, to attempt to claim to be a professional "peer" of the Plaintiff, or factually informed and competent to perform a factual, fact-based, accurate, or truthful evaluation of Plaintiff's performance as a professional, judicial qualifications, or legal acumen.

68.     In contrast to the Nolans and a surprising number of Muskegon-based attorneys, Plaintiff learned to practice law in a non-Muskegon setting in which normal well-qualified lawyers uniformly view back-channel contact with judges about the substance of pending cases, and other questionable practices, to be unethical and forbidden.

69.     If the Nolans wanted to replace existing judges with cooperative judges willing to "play ball" with practices more common in Muskegon than in most places Plaintiff has practiced law, then in that strictly limited sense, the Nolans' one-star out of five assertion of fact would have been correct: To wit, for entirely appropriate ethical reasons, Plaintiff wants no part in practicing law that way.  If the Plaintiff is being rated on practicing law the unorthodox Nolan way, then Plaintiff as a factual matter is diametrically opposite the Nolans on tolerance for such practices.

70.     To the extent such back-channel shenanigans are the Muskegon or the Nolan way, it is perhaps unsurprising that the Nolan firm – using practicing law the Nolan Way as a benchmark – would strongly and factually (objectively, in a very concrete and real sense) prefer different (and more compliant and cooperative) candidates for judicial office.

71.     But that is relevant to voters only in an Orwellian, upside-down, doublespeak sense. A low ranking on practicing law the Nolan Way, in reality factually equates to a top (exceptional) ranking on the question of performing public office in an ethical, appropriate, and sound manner, free from improper influence, without bias, and in strict adherence with law.

72.     Patrick Nolan probably will retire within a few years.

73.     It is perhaps entirely understandable that Pat Nolan would not exactly be eager to envision a future in which his son Geoff maintains a law partnership with Mr. Shafer, indefinitely.

74.     Accordingly, in late 2015, because Hon. Neil Mullally was prohibited from running

again for judicial office, and also because Mullally announced he would not retire early enough for the governor to appoint, an open judicial seat was available.  Although Geoff Nolan had precious little, if any, experience that would have been job-relevant to presiding over a Probate Court docket, Geoff Nolan started gathering signatures to run for Mullally's seat, and in fact did gather the maximum number of signatures needed to place his name on the ballot for said seat.

75.     Nolan never ran for that seat in 2016, however.

76.     Eric Grimm then learned of the open seat, and also started gathering signatures to appear on the ballot for the same seat.

77.     Plaintiff also, in January 2016, prepared a handy comparison chart, reflecting the objective professional credentials of Geoff Nolan, Plaintiff, and two other potential candidates rumored to be interested in running.

78.     Whatever the Nolans may say in public or the media about judicial qualifications, Geoff Nolan's actual **behavior** in 2016 speaks volumes about his, and his father's and Mr. Shafer's actual (concealed) views on who is actually the best-qualified candidate by far.

79.     Upon being invited to fill in the gaps in the comparison chart, and to focus on objective, factual criteria, Geoff Nolan chose not to run for Mullally's seat after all, and started to gather all the signatures to run for a District Court seat, instead.  Accordingly, he gathered all the signatures a second time from scratch, to run for a different office, so as not to have to compete with a much better-qualified candidate.

80.     Geoff Nolan's own behavior is very telling about what the truth always has been.

81.     The Muskegon County Bar Association has bylaws that specifically prohibit the County Bar from rating candidates, or offering endorsements for or against judicial candidates.

82.    There has never been a history in Muskegon County of lawyers "rating" or ranking judicial candidates.

83.    There has never been an agreed-upon and reliable process, developed by a representative and accurate consensus of local lawyers, for how to rate judicial candidates.

84.    Developing such a process in an ad-hoc way, that is designed to advance the financial interest of a tiny clique, rather than a reliable way based on careful procedural development and meticulous reliability, carries the grave risk that the public will be misled, and that mischief will occur.

85.    Nonetheless, David Shafer happened to be a member of the Bench-Bar Committee in 2016, and because his own law partner was running for judicial office (and because Shafer presumably expected that it might be good for him, financially, for his friend Geoff to be a judge), Shafer made a controversial proposal at the Muskegon County Bar summer meeting.

86.    Shafer's proposal was like a lead balloon, and went nowhere.  No consensus, and much reasonable opposition, was voiced.

87.    Other than David Shafer and Geoff Nolan, essentially nobody at the meeting had a positive view about the County Bar undertaking to follow Shafer's suggestion to have a panel of attorneys hand-picked by Shafer alone, choose which judges to support or endorse publicly.

88.    The members then assembled did not even take a vote on Shafer's proposal, so controversial and obviously improper on its face, was it.  Nor was any approval of Shaver's proposal given by the Membership.

89.    Nonetheless, several months later, Shafer recruited a hand-picked panel of only the lawyers he knew would do what he wanted, called a meeting at the offices of the Nolan Law Firm

itself (which had **one of its own members running for judicial office** that election cycle), and started inviting candidates to show up for "screening" interviews.

90.     The process developed by the Nolan Law firm was offensive and outrageous on its face, and obviously rigged and biased from the beginning, such that no reasonable person with the full facts could possibly conclude as a factual matter that it might be legitimate.

91.     More than half of the candidates who were running for office refused even to participate in the rigged and obviously dishonest Shafer/Nolan so-called "peer rating" panel.

92.     Not only the Plaintiff, but other candidates, gave reasons in writing for refusing to dignify this ad-hoc and illegitimate "peer review" kangaroo court with actual participation.

93.     More than one of the candidates lodged formal disciplinary requests with the State Bar of Michigan, as a result of the outrageous and improper way th Nolan firm sought to rig the election in favor of one of its own members.

94.     The Plaintiff also made clear that Plaintiff refused to be rated by the Nolan firm, and specifically advised Shafer and the Nolan Firm were authorized to say only "declined to be rated" about Plaintiff – and nothing else.

95.     It is entirely common in the legal profession, that even with long-standing and more reliable peer review processes (such as Martindale Hubbell), an attorney always can opt out and choose "declined to be rated."  This certainly makes sense – especially in a place like Muskegon – because otherwise, a small clique with a penchant for bullying can use the threat of phony and fake ratings (not to mention adverse Case Evaluation decisions, and other conformity-enforcement techniques) to keep otherwise honest lawyers in line and obedient to what amounts to an old Boys' Club, or what author Barbara Oakley might term a Stable Sinister System.

96.     Nonetheless, despite all the entirely reasonable criticisms of the ad-hoc and rigged, illegitimate Nolan "peer review" process cooked up to produce the result of putting Geoff Nolan on the bench, and to keep better candidates off the bench (and all the lawyers compliant with the local bosses) – the Nolans still went ahead and imposed their will on everyone else, involuntarily.

97.     Even worse, the local newspaper (which has no competition to speak of), the Muskegon Chronicle (MLive) simply went ahead and reported the story as if the "peer ratings" panel was representative, selected through an appropriate and not ad-hoc process, and legitimate.

98.     Pretending that the process was genuine, despite the newspaper's extensive knowledge of multiple reasons to report it was dishonest and questionable, was calculated to cast the numerical rankings and the whole election (including the relative and absolute qualifications of candidates), and to defame each of the candidates ranked lower than or equal to Jeff Nolan).   In other words, every other candidate ranked was insulted and defamed, because all of them were – factually speaking – better judicial candidates than Nolan.

99.      The real story therefore (and the newspaper was copied on the communications pointing out the flaws in the Nolans' approach) was that one law firm was attempting to use an ad-hoc, phony procedure, to attempt to rig a very important local election, for the benefit of its own members.

100.    The local newspaper (and recall its role as a "feeder" to the even worse and more dishonest Newslo reputation-sliming scheme) did not bother to report the real story (the dishonest way the Nolans were seeking to rig the election).  Quite the opposite, the dishonest and deceptive local newspaper actively did its level best to pass the whole charade off as legitimate, while deliberately and misleadingly minimizing criticisms by repackaging them as one word or a handful

of words, so as to prevent the public from knowing the true serisouness and substance of the genuine critiques of the Nolan approach.

101.    A one-star ranking of a professional on a one-to-five star scale, to any reasonable observer, factually asserts that the professional is in the lowest quintile (lowest 20% of the posited "peer" group). Thus, that factual assertion is tantamount to calculating an attorney is in the bottom 20% of all Muskegon attorneys.

102.    From the perspective of objective AVVO rankings, Plaintiff in 2016 was the single best candidate out of all nine candidates running for judicial office in Muskegon Countuy, and had a much higher ranking than any other candidate (and even better than all but a handful at most of attorneys in the whole area).

103.    From the objective and factual standpoint of education, training, and experience, the Plaintiff in 2016, was not only in the top decile (top 10%) of qualifications among the judicial candidates then running, but was far and away the best-qualified candidate.

104.    The only thing that was unusual about the Plaintiff in 2016 is that Plaintiff was running as a reform candidate (in contrast to anyone else in the race), and promising to clean up a bullying problem and other problems that had been long-standing in the courthouse.

105.    Other candidates were afraid of speaking out and telling the truth about the need for reform, as several of them privately confided in the Plaintiff during the election.

106.    Unless the criterion actually being measured actually (and surreptitiously, fraudulently not disclosed by the panel or the newspaper) is a willingness to "play ball" with the corrupt old lawyers' club, nobody in the group of five "peer reviewers" hand-picked by the Nolans for their panel actually as a factual matter considered the Plaintiff among the bottom 20% of lawyers

in Muskegon County, and none of them had any basis to make such a factual assertion about the actual professional acumen (as opposed to low compliance with corruption) of the Plaintiff.

107.    Indeed, Defendant Scott has referred work to the Plaintiff (not what anybody would do to an actual, true, bottom-fifth lawyer), while Defendant Bossenbroek **still is on record on LinkedIn** touting the reality that Plaintiff is a "very competent attorney."

108.    In short, the whole "ratings" charade was transparently a fraud and a farce, calculated to mislead the public and to cast the best lawyers running in a false and defamatory light.

## <u>COUNT THREE – DEFAMATION ON JULY 21, 2016</u>

109.    Plaintiff Repeats and Realleges paragraphs 1-109 as if set forth verbatim herein.

110.    The assertion that Plaintiff is a one-star attorney on a scale of one to five, is an assertion of fact, capable of verification through reliable means (such as a legitimate and non-rigged vetting process, or looking to objective criteria like AVVO uses – client feedback from real job performance in real cases, and professional credentials).

111.    The following defendants, on or about July 21, 2016, made or repeated a false statement in the dominant newspaper in Muskegon (and broadcast it on a newswire and the Internet to the world), about the Plaintiff – specifically," ☆" (one star out of five):  Stephen Kloosterman, David Shafer; The Herald Publishing Company, LLC; MLive Media Group; Associated Press; Brianna Scott; David Bossenbroek; Newslo; Kevin Even; The Washington Times; Raw Story Media, Inc., and Paul Shibley.

112.    Said statement by those defendants was false.

113.    Other quotations attributed to Shafer and the panel by the newspaper were false.

114.    Each and all of the Defendants referenced in this Count knew their assertions were

false, and wanted to harm the Plaintiff, professionally, anyway, out of spite and malice.

115.    Said false statements of the specified Defendants related directly to the profession of the Plaintiff, thus consisting of defamation *per se*.

116.    Said false statements were intended to damage and harm the professional reputation of the Plaintiff, in a catastrophic and devastating way.

117.    Such false statements are categorically defamation *per se* precisely because they target and are intended to target, the plaintiff's profession.

118.    The false statements of these defendants not only were made with actual malice, but indeed were intentionally and deliberately made with the specific intent to harm the Plaintiff, personally, catastrophically, and in a devastating way.

119.    Plaintiff has suffered actual damages as a result of this willful and malicious campaign of character and professional reputation assassination, in an amount far in excess of the jurisdictional threshold of the court.

120.    The following defendants were timely given a reasonable opportunity to retract, and failed to do so:  Stephen Kloosterman, David Shafer, Brianna Scott, David Bossenbroek, Kevin Even, MLive Media Group, The Herald Publishing Company, LLC and Paul Shibley.

121.    None of them retracted, and therefore punitive and exemplaray damages are appropriate.

122.    Raw Story was also invited to perform a normal, journalistic, investigation of all the facts, and to publish a new story about how it and other outlets were tricked by manufactured "Fake News" or "Junk News" during the 2016 election cycle.

123.    Raw Story did not timely retract, correct, or perform a proper journalistic job of

getting and reporting all the <u>real</u> facts.

124.    Accordingly, in addition to compensatory damages, all said Defendants in Count Three are also subject to exemplary / punitive damages.

125.    All these Defendants knew exactly what they were doing, when they did it, and that it was morally reprehensible, and yet they did so anyway out of a pathological desire and intention to do harm to the Plaintiff.

126.    The specific text of the story published by The Herald and Mlive are available online – these are Internet publications – and are incorporated herein by reference.

127.    The entire copy is hereby alleged to be false and deliberately misleading – going so far as to deflect from what the <u>real</u> story ws (namely, a specific law firm unethically and wrongfully attempting to rig an election through intentionally deceptive means).

### <u>COUNT FOUR – JULY 21, 2016 FALSE LIGHT</u>

128.    Plaintiff repeats and realleges Paragraphs 1-128 as if set forth herein verbatim.

129.    On or about July 21, 2017, each of the Defendants identified in Count Three made statements about the Plaintiff that cast Plaintiff and Plaintiff's professional reputation and 20 years of superb professional performance in a false light.

130.    The falsehoods (including but not limited to the one-star rating, the fraudulent claim that this was an actual "peer review," or that any panelists were actually "peers" of the Plaintiff, and fraudulently omitting the entire news story that a specific law firm was seeking to rig the election for the financial interest of a specific candidate, and of the remaining law partner(s) who would then enjoy back-channel access to the judge from the firm once elected) were deliberately intended to, and did, cast the Plaintiff and Plaintiff's professional reputation, as well as the entire peculiar and

suspect circumstances of the ad-hoc and rigged "peer review" panel in a false and misleading light.

131.   The Defendants' actions were done with both actual malice, and with a specific harmful intent, to cause devastating an extreme harm to the Plaintiff's profession.

132.   Plaintiff was harmed, and indeed, devastated, by the morally reprehensible wrong-doing of the Defendants.

133.   Raw Story was offered the reasonable opportunity to do a proper journalistic job, and to get all the facts, and to publish a substitute story to remedy the harm.

134.   Other Defendants named in this Count were all given a timely and reasonable opportunity to retract.

135.   All Defendants failed to retract and/or remedy the harmful falsehoods.

136.   Plaintiff has been harmed as a direct and proximate result of the Defendants' intentional aiming of harmful falsehoods at the Plaintiff and the Plaintiff's profession, and Defendants' specific intent to inflict devastating and sadistic harm.

137.   Plaintiff deserves compensation and also to receive punitive / exemplary damages from the listed set of Defendants.

**THE 2016 ELECTION CYCLE – PUBLIC OFFICIALS
AND ASPIRING PUBLIC OFFICALS AS BULLIES**

138.   In the United States, including in West Michigan, the phenomenon of authoritarianism and of bullying by government officials (including by aspiring government officials), was a widely-reported issue throughout the 2016 election cycle.

139.   For instance, and memorably, British Brexit leader Nigel Farage was widely reported to have heaped praise upon U.S. Presidential candidate Donald Trump by calling him "a big Silverback gorilla," in public remarks about Trump's performance on-stage in a debate with Hillary

Clinton.  As but one illustration, Ros Coward in THE GUARDIAN has analyzed Farage's remarks at some length.  <u>See</u> < https://www.theguardian.com/commentisfree/2016/oct/14/don't-insult-gorillas-compare-them-donald-trump >.

140.   The term "gorilla," standing alone, does sometimes have some archaic 19th century baggage that still has not been completely obliterated from memory.  For instance, as Coward helpfully explains:

> To make comparisons between aggressive human males and gorillas is highly problematic. This is anthropomorphism which projects certain human characteristics it wants to "naturalise" on to the animals, in this instance male predatory sexual behaviour or business dominance and aggression. Aiming it at gorillas is not new. "Gorilla" was, and still is occasionally, used in its more 19th-century way, as an insult implying bestial stupidity.  Now, however, Farage's projections are typical. "Gorilla" is used as a shorthand for aggressive, dominant male behaviour as this Wiki entry makes clear: "'800lb gorilla' is an American English expression for a person or organisation so powerful that it can act without regard to the rights of others or the law.

141.   Not surprisingly, nobody criticized Farage in 2016 as intending to comment (when Farage deployed the words "Silverback gorilla") about Mr. Trump's racial or other immutable characteristics.  It was a remark, instead, about Trump's voluntary behavior in a public setting.

142.   And "conservatives" do not even all consider authoritarianism and bullying a flaw (a "bug" if you will); some inexplicably are predisposed to refere it as a virtue or a feature.

143.   It is possible, and indeed common, in the 21st Century for educated and literate persons to use the word "gorilla" as a metaphor for human behavior, to imply and connote solely hypermasculine bullying behavior, without any hint or whiff of racism, let alone bigotry (which is different from racism), and also without attempting to suggest bestial stupidity in any way.

144.    Moreover, the term "Silverback" or "Alpha Male" has come principally to connote (in conventional use) hypermasculine human behavior, without the 19th century baggage that sometimes has been associated with  "gorilla" standing alone.

145.    In other words, in conventional usage, the conscious choice to substitute the status-suggestive term Silverback (a dominant male; not just any ordinary member of the troop)  and to eschew the more general term "gorilla," can and should reasonably be understood to connote an effort to distance the specific word-choice from any anachronistic (also widely considered characteristic of "conservatives"), 19th century baggage altogether.

146.    During the 2016 election cycle, the historic link between monotheistic religion (another totem for many self-identified "conservatives"), authoritarianism, and bullying, also became a subject of discussion among people who talk about books for a living.  Most memorably, evolutionary biologist David P. Barash of the University of Washington in 2016 published a book (with Oxford University Press as publisher) titled OUT OF EDEN: THE SURPRISING CONSEQUENCES OF POLYGAMY.

147.    Barash also published a much shorter version of his thesis about monotheistic religion and human sexual politics, in the online journal Aeon.co, titled *Is God a silverback?*: *Protective, omnipotent, scary and very territorial. The monotheistic God is modelled on a harem-keeping alpha male*.  Barash, obviously, did not make a point about race, as opposed to a point about most monotheistic traditions and their origin (of Islam, Judaism, and Christianity, at the least) in Mesopotamia and the Middle East.  Conspicuously, the most-studied monotheistic tradition of African origin (the belief system of the !Kung people), is <u>not</u> modeled on a harem-keeping or dominant, male primate – as several scholars have pointed out to Barash in the time since his book

was published.

148.    Plaintiff happened to read the Aeon.co piece by Barash in mid-July, 2016.  Plaintiff also supports the view that Barash's argument cannot be applied to all monotheistic traditions in the world, precisely because it does not account for the !Kung belief system.

149.    It is possible to use the terms "bully" "silverback" and "alpha male" to refer **solely** to human behaviors that tend to be *celebrated* rather than criticized by Republicans and self-identified conservatives, including behaviors often celebrated and not criticized by Michigan Republicans – without intending any connotation related to race whatsoever.

150.    Bigotry – especially religious bigotry among monotheists – exists in West Michigan. This is not to say everyone is a bigot.  Far from it.  But it exists.

151.    Bigotry – especially religious bigotry and bullying by monotheists – exists in the Muskegon County Courthouse.  This is not to say that everyone is a bigot.  But it exists.  And even some of the personnel wearing judicial robes are not immune from or above such tendencies.

152.    There is a critically important difference between being intolerant of voluntary behavior exhibited by a **real bully** (which behavior is simply unacceptable, especially in a sitting judge), see Steven Lubet, *Bullying From the Bench*, 5 Green Bad 2d 11 (2001);   Douglas R. Richmond, *Bullies on the Bench*, 72 LA. L. REV. 325 (2012); Around the ABA, *Lawyer Bullies, What to do about It*, (Nov. 2014), < https://www.americanbar.org/publications/youraba/2014/november-2014/bullying-by-and-of-lawyers.html > – and intolerance directed instead toward an immutable characteristic, such as but not limited to race (which is widely regarded as unacceptable).

153.    Obviously, it is possible, and a good thing, to point out that bullying is unacceptable

and intolerable (even using a very memorable triple-metaphor), without intending in any way to be intolerant of anything irrelevant to the voluntary behavior (such as appearance).

154.    Merriam Webster defines "bigotry" as "obstinate or intolerant devotion to one's own opinions and prejudices."

155.    On the subject of actual *bullying* (which is far too common in this courthouse), if somebody points out the need to include non-Christian religious perspectives on an **equal** (nondiscriminatory) basis, in governmental settings, or to treat unbelievers as equals in the eyes of the law, in the courthouse, then an **obstinate** public message of Christian Supremacy would be strong evidence of bigotry.  Not just religism, but outright bigotry.

156.    In contrast, a speaker who – when an inadvertent event of cluelessness or insensitivity is pointed out – promptly apologizes, addresses the issue, and walks back any intention to deliver a discriminatory message, cannot possibly be called a "bigot."  This is so precisely because the necessary element of stubborn or obstinate continuity of behavior or opinion is not present.  The word "bigot" or "bigoted" is categorically inappropriate, untrue, and misused, under circumstances in which allegations discriminatory intent or meaning are promptly and unequivocally disavowed.

157.    The sign of a <u>bigoted</u> racist is that the bigot doubles-down on the racism and stubbornly refuses to adjust or disavow, even after it is pointed out (sometimes repeatedly, and with escalating urgency).

158.    In contrast, accurately pointing out that a speaker intended solely (and appropriately) to criticize bullying behavior, and to raise public awareness of a longstanding problem, without any intention to insult anyone about immutable characteristics – especially if accompanied by an apology for not realizing that a meaning other than the intended meaning might be misunderstood by some

(especially if some listeners might be highly motivated to misunderstand on purpose), is a sign that the speaker understood from the beginning the key difference between immutable characteristics (which were never the issue in the first place), versus voluntary behavior.

160.    In other words – it is fair game to criticize a bully for being a bully, and even to use memorable and even controversial language to do so, if a reasonble effort is made to make clear through context that the sole intended meaning is about the improper bullying hypermasculine behavior.  It is never fair game to insult a person due to their immutable characteristics, rather than focusing on behavior that people (regardless of characteristic) can learn to change and improve.

161.    It is also categorically inappropriate to "play the race card" and to **pretend** (on purpose) to be insulted, merely to deflect attention away from one's own entirely inappropriate bullying behavior – that would be just as inappropriate if Donald Trump did it, as if someone from another race than Trump did it.  It is entirely inappropriate to pretend, deceptively, to be "the victim" when the judge is in fact the victimizer, and the judge's bullying behavior has been intentionally directed at the critic's elderly mother.

162.    To clarify further about the common and ordinary meaning of the term "bigot," the sign of bigoted religism is that the bigot doubles-down on the supremacy of his or her own religious opinions and (even in a governmental setting) refuses to treat all Americans (of all perspectives, including without limitation, those with no religion) as **equals**, with no person entitled to preference over any other on the basis of personal beliefs.

163.    Plaintiff, in contrast to many in Muskegon County, is a staunch public, and consistent advocate of religious equality and real religious freedom (which concepts re both categorically different from bigoted and stubborn discrimination in the form of Christian Supremacy.

164.    Religious bigotry was on display, in public, in the Muskegon County Courthouse, in October, 2014, with most of the judges at the front of the courtroom and a large number of lawyers present.  Not one of the judges, despite repeated invitations to do so, has walked the bigotry back.

165.    We know it is bigotry, and not an inadvertent mistake, precisely because the judges presiding at the front of the room that day, have been invited repeatedly to retract and apologize. And none have.  Those responsible have been invited to make video of the event public, so the public can see for themselves.  Instead, a cover-up of the public display of bigotry has occurred.

166.    And one or more bullies doubled down even further, first by unlawfully going after the Plaintiff's eldrly mother,and then (even worse) going after the Plaintiff's job, in order to punish Plaintiff for opposing systemic bigotry.

167.    Bullying from the Bench is a too-common phenomenon in many American courtrooms (among other common-law countries).  See law review articles, *supra*.

168.    A pronounced and persistent Bullying From the Bench problem has existed in Muskegon County, Michigan, at least since 2002 (when out-of-state newspapers reported about one judge's conduct, although Mlive perhaps may have overlooked the story).

169.    The Bullying from the Bench problem in Muskegon County did not go away after 2002, but continued.

170.    Plaintiff has personally been bullied by a judge in the Muskegon County Courthouse, starting in 2012.  The problem – which also involved the bullying of Mr. Grimm's elderly mother – grew more severe and especially acute in or about October, 2014.

171.    The judge responsible for the bullying, first and foremost is a Republican, and is an

appointee of the Engler administration.

172.    Race is irrelevant, when the actual subject under discussion is individual voluntary behavior.  The judge's behavior still would be wrong – categorically inappropriate – even if the judge looked like Donald Trump, rather than photographs appearing in newspapers and online in 2016 (including, as intended on Newslo), in connection with the defamatory and devastating intentionally false statements that are the subject of this lawsuit.

173.    Happening to be of a racial, religious, or other minority is never an excuse for bullying.  And none of these can possibly justify the bullying.

### THE PLAINTIFF'S TRACK RECORD

174.    The Plaintiff, Eric Grimm, did not start practicing law in Muskegon, Michigan.

175.    Eric Grimm returned to Muskegon Michigan, after more than fifteen years in practice elsewhere, because his father (a District Court Judge in Muskegon County) was dying of cancer, and Mr. Grimm's elderly mother could not take care of herself.

176.    Mr. Grimm's credentials (a National Merit Scholar, honors graduate of a top law school, judicial law clerk, etc.), are very uncommon in the Muskegon legal market.

177.    It is possible that some degree of envy or jealousy were directed unfairly in Mr. Grimm's direction, following his return to Muskegon, by lawyers who had different history, experience, and credentials.

178.    More importantly, in addition to stepping in to care for an elderly parent, and **also actually representing several Muskegon County judges when they were sued in court** (successfully each time), Mr. Grimm also took community service very seriously.

179.    Grimm is the lawyer who – free of charge – formed a 501(c)(3) nonprofit corporation

for the Muskegon Social Justice Commission, the purpose of which was to combat lingering and persistent racism and other social ills in the Greater Muskegon area.

180.    Plaintiff for several years, served on the Diversity and Inclusion Committee of the Muskegon Rotary Club, and was an outspoken advocate against racism in all its forms, in favor of sex equality and equal rights for GLBT persons, and in favor of religious equality and diversity.

181.    Grimm's track record opposing racism, opposing inequality between men and women (and inequality based on gender identity) and opposing religious bigotry was widely known in Muskegon (especially in the courthouse), and generated no small amount of irrational and bigoted resentment in Republican and conservative West Michigan Christian circles.

182.    Eric Grimm served on the City Council of Roosevelt Park, and starting in 2009, made headlines for publicly urging Roosevelt Park to go from a 30-year (or more) history of Christian-only prayers at meetings, toward a more inclusive approach, that treated all perspectives as equals, with preference toward none.

183.    In 2012, Eric Grimm ran again for City Council to unseat a former Roosevelt Park police chief, who actively campaigned against Grimm, by making atheism an election issue (Grimm's issue was equality of everyone – Sikhs, Christians, Muslims, nonbelievers, everyone). Grimm won; the religious supremacist lost.  The former police chief who was antagonistic on religious discrimination grounds, lost.

184.    In 2015, Eric Grimm resigned early from City Council – and made headlines again – because not just Roosevelt Park, but the Muskegon area as a whole, was not doing enough to overcome a dreadful history as the 19th most-segregated Standard Metropolitan Statistical Area in the United States, and it was frustrating to deal with resistance from Republican / conservative

elements, who wanted to fight against progress on issues of equality (not just race, but also religious equality, equality for men and women, and equal rights for GLBT persons).

185.    The reason West Michigan Republicans (including Gregory Pittman and Kevin Even) hated Eric Grimm is not because he was "a bigo[t]," to quote Greg Pittman's defamatory falsehood (Grimm, obviously, was the exact opposite, a critic of real bigots) – but because he was exposing longstanding bigotry to the sunshine of transparency, and was actively fighting against bigotry.

## MARTHA GRIMM CONSERVATORSHIP

186.    When Eric Grimm's later father passed away, Eric's mom (Martha Grimm) had a substantial retirement nestegg left to her.

187.    Eric (over some resistance, including in the courts, and at no small expense to himself) has made sure his mother has a suitable house to live in.

188.    From 2012-2015, Eric Grimm served as his mom's conservator, and actively protected her from financial harm.

189.    The rest of the time from 2009 to the present, the financial and court records speak for themselves, and do not offer a pleasant view of the behavior of Gregory Pittman and others.

190.    Initially, Martha Grimm's conservatorship was assigned to the Hon. Neil Mullally. The case remained with him until October, 2012.

191.    In late 2012, Judge Mullally was contacted *ex parte* by the Hanleys, a family that Mullally knew for many years, and that were active politically in West Michigan Right-to-Life circles.

192.    The son of Barbara Hanley (now Barbara Kleaveland), Gabriel Smith, was charged with felonies by the Prosecutor's Office, because of financial misconduct by Gabriel, some of which

(According to testimony delivered at a prelim in which Gabriel was bound over for a felony trial)
targeted Martha Grimm, a vulnerable adult.  Gabriel now is a felon, because of crimes that Gabriel
directed at Michael Grimm, Martha's son and Eric's brother.

193.    Immediately upon the ex-parte back channel communication from the Hanleys to
Judge Mullally, the Martha Grimm conservatorship case was reassigned to Hon Gregory Pittman.

194.    It is far from clear why Judge Pittman did not immediately reassign the case to an
out-of county judge in 2012.  However, it took until early 2017 for Judge Pittman to do so.

195.    In the meantime, hundreds of thousands of dollars of Martha Grimm's retirement
savings were diverted (over Martha's and Eric's repeated objections) away from Martha's benefit,
to become income instead for several lawyers, an accounting firm, a "professional" conservator
(appointed without following black-letter requirements of the governing statutes), and other regulars
in Judge Pittman's courtroom.  Martha Grimm's case is hardly the only one involving a similar
troubling pattern of doing the exact opposite of "protecting" assets that are legally required to be
protected.

196.    In roughly May or June, 2015, because Judge Pittman wanted it done that way, a
meeting was held **off the record**, in a room at the Probate Court.  On top of bullying by multiple
attorneys, Judge Pittman eventually came in and joined in the off-record bullying.

197.    During that off-record event, Judge Pittman candidly admitted in front of multiple
witnesses to Eric Grimm that "mistakes have been made" in the court's mis-handling of Martha
Grimm's financial affairs.

198.    Judge Pittman has never had the integrity to use the words "I made a mistake,' or to
fix the mistakes that occurred during his watch – when his job was to safeguard Martha Grimm's

retirement savings.  He did the opposite, and then like a true authoritarian – refused to take personal responsibility for his own "mistakes" (which appear to have been deliberate), and instead deflected and blamed someone else.

199.    The job of the Republican judge, Judge Pittman (at least if statutes are followed), was not to subject the retirement savings of a judicial widow to organized looting, using the coercive power of government as the means to accomplish the diversion of money she needed for a lifetime of medical care.

200.    Not everything was done off the record, and the Bullying from the Bench problem is especially evident from the video of several on-record hearings presided-over by the bully judge.

201.    The video of the hearings at which bullying occurred is discoverable, using a subpoena under rule 45 of the FEDERAL RULES OF CIVIL PROCEDURE.

202.    In the meantime, multiple efforts have been made to release the courtroom videos for public viewing.  And the Muskegon County Courthouse refuses to release them, without Gregory Pittman acting as gatekeeper, to block public viewing of his videotaped behavior.

203.    On information and belief, the on-record bullying episodes in the Martha Grimm case are hardly the only episodes in which this sort of thing has occurred.  If video is made available to the public, we expect that important material will surface from many, many cases.

## COUNT FIVE – DEFAMATION ON JULY 19, 2016

204.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1-204, as if set forth verbatim, herein.

205.    The assertion by Defendant Pittman, or anybody else (newspapers republishing defamatory and devastating falsehoods), that the Plaintiff is "a bigot" – when the exact opposite is

true (the Plaintiff is a steadfast critic and opponent of bigotry) – if made – would be expected by any reasonable person to be devastating, to be profoundly harmful to one's profession and career, and to cause severe harm.

206.    Throughout the 2016 campaign cycle, Plaintiff attempted to raise awareness of a need for reform (and to combat corruption) in the Muskegon County Courthouse, as well as the urgent need to address a bullying problem.

207.    As the bullying has been going on consistently since at least 2002, most people in Muskegon – when the word "bully" or "bullying" alone was (or is) used to draw attention to the problem – continued to ignore the problem, as the problem had been improperly normalized.  Those who thought it was wrong had been conditioned to feel helpless and powerless to confront the bully.

208.    Accordingly, emphasizing the problem in a more memorable way (while specifically choosing words to make clear that the **intended** meaning is solely about improper voluntary behavior, and has **nothing** to do with any immutable characteristic), was entirely appropriate. Because if the approach using a simple term is ignored, it is only reasonable to direct attention to the still-uncorrected, and deadly serious problem.

209.    It is categorically false that there was any "backlash" (at least no community-based or grassroots "backlash" in Muskegon) to the actual words selected by the Plaintiff.  There were some people (purposefully deprived by Defendants of any local context) who got stirred up by the Newslo defamation.  But that is emphatically not the same thing as any real local "backlash" by anyone other than a handful of politicians with a wrongful agenda.

210.    Instead what happened, was a tiny handful of individuals with a political agenda (Gregory Pittman, DJ Hilson, a couple of radio personalities, and Terry Sabo, a candidate for the

Michigan Legislature, as well as Sabo's campaign staff), attempting to manufacture in the press the **false appearance** in the media (in a top-down, agenda-driven way) reports about a "backlash."

211.    Some people were mistakenly stirred up (stirred up on purpose by the deceptive politicians) by the defamatory, and false, misattribution of the word "gorilla" until they learned that the word was **never** selected (and carefully avoided) by the Plaintiff.

212.    Indeed, the Plaintiff picked specific words to convey a meaning that was **all about bullying** (voluntary behavior), and had nothing to do with immutable characteristics.

213.    Knowing the Plaintiff's actual history of publicly opposing bigotry (to some local Republicans' acute discomfort) and of having experienced some real problems including extreme and reprehensible bullying in the courthouse, no reasonable person could believe or assert that "bigot[ry]" was afoot, except the bullying directed at the Plaintiff, rather than the other way around.

214.    Stephen Kloosterman, who wrote the story at the behest of the handful of politically-motivated people with an agenda (namely, to protect and preserve a "stable sisister system" in the courthouse against proposed efforts at reform), and who also chose to use the AP wire to get the story in the hands of the "Junk News" machinery carefully documented by Oxford researchers, knew full well what Plaintiff's history was opposing bigorty (and also had plenty of documents about all the other backstory facts, including the looting by a court of Martha Grimm's retirement savings). And yet, Kloosterman deliberately (and knowing it was false) wrote and published the intentionally misleading and false story about completely phony racism and completely phony "bigot[ry]" anyway.

215.    The email that Plaintiff sent to a limited mailing list (that included Kloosterman) did not make the Greg Pittman issue the first item, even.  The first item had to do with courthouse

management. The same email also pointed out how profoundly improper the ad-hoc and rigged Nolan "peer review" charade was.

216. The paragraphs about Greg Pittman were absolutely truthful and made it clear that bullying was the issue and the sole issue.

217. No reasonable person reading the words actually used (including references to the bullying problem in several places), could infer an intent to say anything other than "this guy is a bully and it is a real problem."

218. The triple metaphor that was selected included the following on-point elements:

a. "The elephant in the room" (a phrase out of the recovery movement, that conveys the social dynamic in addicted, or authoritarian – especially religious – families that bringing up the truth can result in scapegoating, which is exactly what occurred here) – and the bullying problem, obviously, is exactly that in Muskegon – it is an elephant in the courtroom;

b. "800 pound" (word gorilla specifically omitted) – commonly understood to convey "a person or organization so powerful that it can act without regard to the rights of others or the law" – and which is spot-on for the behavior of the "old boys club" in Muskegon County, and especially one Republican probate court judge (Pittman) in particular; and

c. "Silverback alpha male" (which is different from any ordinary gorilla), which has everything to do especially with religiously-motivated bullying, and conveys hypermasculine bullying behavior, not anything about race.

219. One has to be pretty highly motivated (this is called "deflection") to attempt to

transform a genuine and necessary, on-point raising of the subject of bullying, into something else entirely – namely a disingenuous "race card" charade that occurred in both national and local media (all Defendants), without any real substance or factual basis.

220.    Nonetheless, Gregory Pittman, at the urging of some other local politicians, issued a statement on court letterhead, targeting Plaintiff with the false and thermonuclear epithet "bigo[t]." Specifically, the phrase falsely employed by him was "bigoted remarks."

221.    That is categorically false.  There were never any such remarks.  And nobody (especially a judge who deserves valid criticism of the judge's bullying) gets to impose a "hecklers veto" by falsely playing the "race card" when the judge actully knows full well that the judge's gaslighting is completely fake, fraudulent, and phony.

222.    The mere mistaken perception, when the purportd gaslighting meaning could not possibly have been the _intended_ meaning, does not transform remarks into something they never were, not could have been, in the first place.

223.    If a judge really is a narcissistic bully who does not follow the law, then saying so (even using a triple metaphor) still is not about anything other than the judge's own voluntary behavior.  There is nothing remotely "bigoted" about either the remarks or the speaker.  And any judge behaving the exact same way (regardless of immutable characteristics) – even if the person behaving that way is an elderly woman of European ancestry in a wheelchair – would still be behaving like a bully.

224.    The letter on court letterhead was not subject to absolute judicial or privilege, because the judge was acting solely in a non-judicial capacity as a candidate intending to run in 2016, because he was trying to bully the genie of truth back into the bottle, to protect his own income and

re-election, chances, and most of all power.  Judge Pittman was not in any way acting in a judicial capacity, but merely was attempting to act as a political candidate who is up for re-election in two years, attempting to deflect from the truth of a valid criticism that people are going to remember (and use to inform their votes) in 2018.

225.    There is a process in the Michigan Court Rules, to address false statements by attorneys (but this was **not** a false statement about Pittman in the least – the videotapes, once the cover-up ends, will show what happened in court).  As is his penchant and custom, Judge Pittman did not even follow the proper procedure in the Court Rules when issuing his memo.

226.    Leveling the false (absolutely upside down) theromnuclear epithet "bigot" or "bigoted" was false.  Categorically false, offensive, and personally devastating.

227.    It was known to be false by Pittman, and by all the Defendants, at the time Pittman issued the memo. And at the time that the newspapers and Kloosterman intentionally performed the first step of the daisy-chain of escalating distortion, to feed the Newslo "Junk News" octopus.

228.    It was published not only with actual malice, but with the specific intent to harm the Plaintiff personally, by publishing falsehoods about him.

229.    The political "old boys club" in Muskegon (of which Republican Pittman is a part, and a major player) was tired of having the religious bigotry in the courthouse exposed, and other problems discussed in a public way – and specifically sought to manufacture a false attack on the Plaintiff as "payback" for speaking the truth, and in an effort to silence a truthful critic.

230.    It was classic scapegoating – just like the authoritarian Lear attacking Kent and Cordelia in the first Act of King Lear.  Examples of the exact same phenomenon by authoritarians abound in history and in psych literature.

231.    The Defendants all acted with actual malice and, indeed, with malicious intent.

232.    The intended devastating personal and professional harm that the Defendants actively sought to inflict as "payback" did in fact materialize.

233.    The Plaintiff should receive compensatory damages in an amount well in excess of the jurisdictional limit of the Court (several multiples thereof).

244.    All Defendants (except Dieters, AP, Washington Times, and Newslo) have been given a reasonable, written opportunity to retract.

245.    None have timely done so.

246.    All except Dieters, AP, Washington Times, and Newslo) also should pay punitive / exemplary damages (because of statutory notice).

247.    At no time did the Plaintiff "whine" about anything.   The Plaintiff's response – recorded in Kloosterman's story – to the top-down (emphatically not grassroots), manufactured, phony "backlash" that was confined principally to the Old Boys Club, was entirely appropriate: (1) disavow any intent to criticize about race or any other immutable characteristic; (2) point out truthfully, that there is a whole other side that news consumers need to hear (Dieters did hear the other side, and left it on the cutting room floor, on purpose in order to do a hatchet job on television; Kloosterman also intentionally left out the whole story – and the more important stories about over a decade of Bullying from the Bench, and about a law firm rigging press coverage to manipulate an election); and (3) make clear what the **intended** meaning always has been.   With that (entirely proper and dignified) correction, there is obviously nothing in the **originally intended** meaning (once clarified) to apologize for in the least – because it is true and the bullying is sever.   It requires attention and correction.   And if uncorrected, it required voters' attention in 2018.

248.     Even though Raw Story did not bother to perform proper journalism on the story, Raw Story knew and had to know from the wire story it picked up, that there was nothing in the story supporting any categorically false and defamatory allegation by Raw Story about "whining."

249.     Raw Story acted with actual malice – and with specific intent to harm what was **falsely perceived** to be a white, West Michigan, Republican (when in fact, Greg Pittman is the political enemy of Raw Story and progressives, everywhere, and the Plaintiff is an ally who works tirelessly to combat bigorty and racism.  Oops.  You blew it badly Raw Story, you were suckered by "Junk News" in a spectacular way).

250.     Raw Story has been given a reasonable written opportunity to retract.

251.     Raw story has failed to do so, and therefore is liable for exemplary / punitive damages.

### COUNT SIX – JULY 19, 2016 FALSE LIGHT

252.     Plaintiff repeats and realleges the allegations set forth in paragraphs 1-252, as if set forth verbatim, herein.

253.     On or about July 19, 2017, each of the Defendants identified in Count Five made statements about the Plaintiff that cast Plaintiff and Plaintiff's professional reputation and 20 years of superb professional performance in a false light.

254.     The falsehoods (including "bigot" in its various forms, "whine," and other thermonuclear calumnies) were intended to, and did, cast the Plaintiff and Plaintiff's professional reputation, as well as the peculiar and suspect circumstances of the decision by a handful of political operatives (not any "grassroots" in any material numbers) to manufacture a false narrative, in an effort to employ the "race card" falsely to deflect from a continuing (and unrepentant and

unapologetic) patten of bullying from a judge who does not belong on the Bench.

255.    The Defendants' actions were done with both actual malice, and with a specific harmful intent, to cause devastating harm to the Plaintiff's profession.

256.    Plaintiff was harmed, and indeed, devastated, by the morally reprehensible wrong-doing of the Defendants.

257.    Raw Story was offered the reasonable opportunity to do a proper journalistic job, and to get all the facts, and to publish a substitute story to remedy the harm.

258.    Other Defendants (except AP, Washington Times, Nweslo, and Dieters) were given a timely and reasonable opportunity to retract.

259.    All Defendants invited to do so failed timely to retract and/or remedy the harmful falsehoods.

260.    Plaintiff has been harmed as a direct and proximate result of the Defendants' intentional aiming of harmful falsehoods at the Plaintiff and the Plaintiff's profession.

261.    Plaintiff deserves compensation and also to receive punitive / exemplary damages from the listed set of Defendants.

## COUNT SEVEN – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

262.    The allegations in Paragraphs 1-262 are repeated and realleged as if set forth herein verbatim.

263.    The conduct of all the defendants was devastatingly harmful to the Plaintiff.

264.    The Defendants' conduct was intentional and/or reckless, in relation to the expected extreme emotional harm to the Plaintiff.

264.    The Defendants intended to, and did, inflict severe and extreme sadistic emotional

harm, trauma and torment on the Plaintiff by smearing his reputaton and destroying his professional career.  As payback to punish a do-gooder, which makes it all the worse.

265.   The voluntary conduct of each and all of the Defendants, was extreme and outrageous, out of all bounds of conduct in a civilized society.

266.   The Plaintiff is entitled to all remedies allowed by law from each and all of the Defendants.

## CONCLUSION AND PRAYER FOR RELIEF

Wherefore, premises considered, Plaintiff is entitled to and should receive from each Defendant, full and fair compensation for the devastating and cruel harm to reputation and emotional torment inflicced by each and all of the Defendants, jointly and severally.  Plaintiff so prays, and also prays for punitive / exemplary damages to be paid by each of the Defendants who were given written opportunity to fix their misconduct, and who capriciously failed to do so.

## JURY DEMAND

Plaintiff respectfully demands a jury on all issues so triable.

Respectfully submitted,

Dated: July 19, 2017

_____/s/ Eric C. Grimm_____
Eric C. Grimm (P58990)
ERIC C. GRIMM, PLLC
1017 West South Street
Alvin, TX  77511
Main: (734) 717-4900
Fax: (888) 502-1291
Email:  ecgrimm@umich.edu
Attorney for Plaintiff.