UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | | |
|---|---|---|
| Eric C. Grimm, | | |
| Plaintiff, | | |
| vs. | Civil Action No. 17-cv-654 | |
| Raw Story Media, Inc., The Herald Publishing Company, LLC, MLive Media Group, f/k/a Booth Newspapers, Inc., Newslo, Stephen Kloosterman, Kevin Even, Paul Shibley, Brianna Scott, David Bossenbroek, Matt J. Roberts, David Shafer, Barton Dieters, Gregory C. Pittman, Williams \| Hughes, PLLC, Douglas Hughes, Theodore N. Williams, Jr, Timothy Hicks, William Marietti, Kathy Hoogstra, Robert Carter, Raymond Kostrzewa, Linnea Kostrzewa, Mark T. Boonstra, Neil Mullally, Vicki Broge, and the County of Muskegon, | Hon. Gordon J. Quist<br>United States District Judge<br><br>Hon. Philip J. Green<br>United States Magistrate Judge | |
| Defendants. | | |

Eric C. Grimm (P58990)
ERIC C. GRIMM, PLLC
P.O. Box 1266
1017 West South Street
Alvin, TX  77512-1266
Main: (734) 717-4900
Fax: (888) 502-1291
Email:  ecgrimm@umich.edu
Attorney for Plaintiff.

Allan C. Vander Laan (P33893)
Curt A. Benson (P38891)
CUMMINGS MCCLOREY DAVIS & ACHO PLC
327 Centennial Plaza Bldg.
2851 Charlevoix Dr., SE
Grand Rapids, MI 49546
(616) 975-7470
Email:  avanderlaan@cmda-law.com
Attorney for Muskegon County and
MMRMA Defendants.

**PLAINTIFF'S OPPOSITION AND SUPPORTING BRIEF TO MUSKEGON COUNTY / MMRMA DEFENDANTS' RULE 12 MOTION TO DISMISS**

Plaintiff respectfully opposes the Motion of the County of Muskegon and other Defendants

represented by the same law firm, seeking dismissal of Plaintiff's claims against the Muskegon County / MMRMA Defendants.  The Issues Presented are as follows:

## ISSUES PRESENTED

I.  **Possible Question for Appellate Certification:** This case presents a novel and important constitutional question, involving religious content in government ceremonies.  Unlike Town of Greece v. Galloway, 572 U.S. ___ (2014), and Marsh v. Chambers, 463 U.S. 783 (1983), both of which involved the First Amendment and pre-meeting practices of **legislative** bodies, this is a case about **judges** (albeit, judges acting in a ceremonial, or political, or at best, administrative capacity; not performing any judicial role in any contested case).  The Supreme Court has not yet entertained a judge / religion ceremonial case, parallel to Marsh (Nebraska Legislature) or Galloway (municipal town council) (although the Amici in Galloway made numerous references to a disturbing episode involving the Alabama Public Service Commission – and Justices at argument were intensely interested in this question).

One or more MMRMA Defendants, if a qualified immunity defense to a civil rights count is denied (as is likely), may elect to take an immediate appeal (which will also fail).

Plaintiff **agrees** with the MMRMA Defendants (at least in part) that the **right** legal standard to apply in a ceremonial case involving judges (as opposed to legislative bodies) includes the time-honored Establishment Clause test in Lemon v. Kurtzman, 403 U.S. 602 (1971).  To be more specific, precisely because of the special role of judges in our society (and the recognized need not only for actual impartiality but also apparent impartiality and fairness), the standard to apply is the **strict neutrality** test enshrined by the Supreme Court in over twenty published majority opinions – requiring governments and government

officials to maintain "neutrality between religion and religion, and between religion and nonreligion,'" whenever acting even in an <u>arguably governmental</u> (<u>i.e.</u>, not purely private) capacity.  <u>E.g.</u>, <u>McCreary County v. ACLU of Ky</u>, 545 U.S. 844, 860, 125 S. Ct. 2722 (2005) (quoting <u>Epperson v. Arkansas</u>, 393 U.S. 97, 104 (1968); <u>Everson v. Board of Ed. of Ewing</u>, 330 U.S. 1, 15-16 (1947); <u>Wallace v. Jaffree</u>, , 472 U.S. 38, 53 (1985)).  Notably, the MMRMA Defendants' position mirrors the dissent by Justice Brennan in <u>Marsh v. Chambers</u>.  Plaintiff, in addition[1] to advocating for the <u>strict neutrality</u> rule in judicial ceremony cases (so as to prohibit, with a bright-line rule, things like the appalling spectacle before the Alabama Public Service Commission, that featured prominently in the <u>Galloway</u> briefs, or the in-your-face Christian Supremacy on display in Muskegon County in October, 2014), also argues that <u>Marsh v. Chambers</u> was wrongly decided.  It is inconsistent with, and offensive to, the entire body of First Amendment jurisprudence that preceded <u>Marsh</u>.  Even Chief Justice Rehnquist, in <u>Van Orden v. Perry</u>, derided the inconsistent, conflicting situation after <u>Marsh</u>, as "Janus-like" and two-faced.  So long as <u>Marsh</u> exists, the inconsistency is seemingly engineered to propel more and more cases into the appellate courts, thus multiplying confusion and strife.  Moreover, given the proliferation of ceremonial and prayer cases following <u>Galloway</u>, the Supreme Court's effort in <u>Galloway</u> to shun its constitutional obligations (namely, to protect the rights of religious minorities from majoritarian abuses) in favor of political "culture wars" in hamlets and villages across the land, has **<u>failed spectacularly</u>**.  Justice Robert Jackson instead got it exactly right in

---

[1] In contrast to <u>Marsh</u>, Plaintiff also is not aware of any even arguable pedigree in the founding-era history, or tradition, for what took place in the Muskegon County Courthouse in October, 2014.  All comers certainly are invited to scour the historic record for anything similar.

West Virginia Bd. of Ed. v. Barnette, 319 U. S. 624, 638 (1943), that "fundamental rights may not be submitted to vote; they depend on the outcome of no elections."  See also Santa Fe Independent School District v. Doe, 530 U.S. 290 (2000) (quoting Barnette).

The Sixth Circuit, in its 9-6 legislative (not judicial) ceremony opinion, Bormuth v. Jackson County, <www.opn.ca6.uscourts.gov/opinions.pdf/17a0207p-06.pdf>, got the legal test dead wrong.  The answer is to overturn Marsh altogether, in favor of the bright-line neutrality test, not to enable governmental abuses by requiring actual coercion.  Due to a clear Fourth / Sixth Circuit split, Bormuth appears likely to prompt a Certiorari petition.  If this case can rise quickly enough, it would be a good candidate for consolidation with Bormuth, to enable the Supreme Court to deliver guidance more practical than Galloway.

In any event, Plaintiff already anticipated the misadventure by the Sixth Circuit in Bormuth, and already included factual allegations that precisely track the newly-minted "magic words" of Bormuth.  In this case, the Muskegon County courts – right after (the same month) the judges unapologetically indoctrinated lawyers and county staff with the false theocratic message that "the judge's power comes from God" (both the Michigan and the U.S. Constitutions expressly say otherwise) – targeted the Plaintiff personally with coercion.  Specifically, the county courts immediately turned around **exactly like** the **arbitrary** authoritarian bully[2] who allegedly spoke telepathically to Abraham in Genesis 21-22,[3] and

_____

[2]Many devout believers get upset when nonbelievers like Richard Dawkins point out, for instance, that "The God of the Old Testament is arguably the most unpleasant character in all fiction: jealous and proud of it; a petty, unjust, unforgiving control-freak; a vindictive, bloodthirsty ethnic cleanser; a misogynistic, homophobic, racist, infanticidal, genocidal, filicidal, pestilential, megalomaniacal, sadomasochistic, capriciously malevolent bully."  Plaintiff respectfully suggests that those who become upset about such an observation ought to **read** the

(continued...)

took the Plaintiff's elderly mother (a judicial widow; she had been married to a 30-year sitting judge in that self-same courthouse) <u>hostage</u>, completely disregarded the Rule of Law, the MICHIGAN COURT RULES, and the ESTATES AND PROTECTED INDIVIDUALS CODE, and turned her – <u>just like Isaac</u> to Plaintiff's Abraham – into an intentionally <u>coercive</u> test of Plaintiff's blind obedience to **arbitrary authoritarianism** (in contrast to the Rule of Law that Michigan courts are supposed to follow). But Plaintiff is not a prehistoric shepherd; Plaintiff is an American citizen with constitutional[4] and procedural rights of which Abraham never even dreamed.[5] Plaintiff took an appeal. Plaintiff then got discriminatorily and

---

[2](...continued)
Old Testament and consult their own religious pastors, priests, and rabbis. The <u>text itself</u> presents overwhelming support for this entirely reasonable observation.

[3]Muskegon County, of all places, ought to be especially circumspect about efforts to recreate (through a pervasive culture of <u>religious</u> bullying) dramatic episodes that invite easy comparison to the Abraham / Isaac episode. <u>See</u> Lynn Moore, *Look back: Thanksgiving foundry-ladle murders of two young boys*, MLive (Nov. 26, 2017), <
http://www.mlive.com/news/muskegon/index.ssf/
2017/11/look_back_thanksgiving_foundry.html >. Plaintiff, whose mother also has been treated "differently," since the 1970s in Muskegon County because of her mental health challenges and the backward, medieval, culture prevalent there, is acutely aware of how mental health challenges often are treated in Muskegon as an invitation to turn vulnerable people into scapegoats. And, indeed, scapegoating (by a community awash guilt for decades of shameful things and intent above all else on keeping its secrets) is exactly what occurred here. Plaintiff, too, was made a scapegoat for the "unforgivable" sin of presuming to speak truth to power. Didn't that also allegedly happen in a Roman court case, held in Jerusalem after the scapegoat spent a week upsetting all the right people?

[4]Not to put too fine a point on it, but Plaintiff's Gospel (good news) is this: The **secular** (nonreligious) prophets, Madison and Jefferson and Franklin, gave us the answer (the Rule of Law, and the principles of Enlightenment rationalism) to break the cycle of barbaric scapegoating. Not everyone (Roy Moore, for instance) is receptive to the message, which is regrettable.

[5]In one case Plaintiff handled before a very conservative federal judge, Hon. Robert Cleland, in Detroit (the <u>Ford. v. 2600</u> case), Plaintiff was pleased to walk into court and learn

(continued...)

capriciously fired for even hiring a lawyer <u>to make an appellate record</u> to take the appeal.

Consider this: The words of the Constitution and the Court Rules are just that – words – without principled, fair, diligent courts doing the job of giving the words practical effect (respecting the Rule **of Law**, not advocating the Divine Arbitrary Power of **Judges**). Our justice system (and, in turn the willingness of the population to turn to courts rather than more disruptive approaches for resolving conflicts great and small) depends critically on the ability of all parties in the case to have confidence they can rely upon courts to do their jobs.[6]

---

[5](...continued)
quickly how well Judge Cleland understood the importance of the Rule of Law.  Particularly impressive was Cleland's ability to quote a key passage from Robert Bolt's play *A Man for All Seasons* (also a favorite of Plaintiff's father) from memory (emphasis added):

| | |
|---|---|
| William Roper: | So, now you give the Devil the benefit of law! |
| Sir Thomas More: | Yes! What would you do? Cut a great road through the law to get after the Devil? |
| William Roper: | Yes, I'd cut down every law in England to do that! |
| Sir Thomas More: | Oh?  And when the last law was down, and the Devil |

turned 'round on you, where would you hide, Roper, the laws all being flat?  This country is planted thick with laws, from coast to coast, **Man's laws, not God's**!  And if you cut them down, and you're just the man to do it, do you really think you could stand upright in the winds that would blow then? Yes, I'd give the Devil benefit of law, for my own safety's sake!

Bolt's insight into the importance of the Rule of Law is perhaps worth pondering.  Too bad Michigan's state courts seem to be so bad, lately, at understanding this.

[6]There are good reasons (and the <u>Martha Grimm</u> case is hardly the only example) to conclude that Michigan's state appellate courts are **not** doing their jobs and have been shirking their responsibility to protect vulnerable seniors and disabled people like Martha Grimm, **for decades**.  See **Exhibit One**.  Plaintiff is also eager to deliver, to anyone willing to listen, a surprising and alarming litany of specific examples (such as a series of Blue Cross Blue Cross Blue Shield of Michigan cases, or the manufacture since 2010 by the Tax Tribunal and certain appellate judges – contrary to known precedent – of the controversial "dark stores" valuation

(continued...)

The <u>Rooker-Feldman</u> doctrine (what is left of it) and immunity doctrines, that Plaintiff respects, mean that <u>this case</u> cannot seek the same relief prayed-for in the two Petitions attached as **<u>Exhibit One</u>**.

And not surprisingly (the MMRMA Defendants' misleading and false assertions aside), this case seeks different relief about <u>very specific</u> things. For instance, there was <u>no way</u> in the state appellate courts in an appeal from a <u>real estate</u> order, for the Plaintiff to ask for any remedy for religiously-motivated employment discrimination (with the <u>probate judge</u> acting as the employment decision-maker). <u>This</u> really is the forum for that. And the other issues that Plaintiff has raised in federal court, <u>directly track</u> the narrow exceptions to immunity that MMRMA defendants concede exist in law. This case is <u>only</u> about issues that Plaintiff <u>does</u> have every right to raise in a federal forum, and immunity serves as no bar.

Returning to appellate certification, Plaintiff respectfully suggests that the issue of which legal test applies in judge-ceremony (as opposed to legislative-ceremony) cases, including what must be alleged, specifically, to state an Establishment Clause and Equal Protection Clause claim under Section 1983, should be certified for appeal to "piggyback" on any interlocutory appeal that the MMRMA Defendants might take.

The issue of whether <u>Galloway</u> and <u>Marsh</u> should be overturned, also is a suitable (and advisable) subject for certification.

---

[6](...continued)
methodology that has needlessly shifted billions in property taxes off of "big box" retailers onto ordinary homeowners) in which the appellate courts in Michigan have shirked a multitude of responsibilities to rise above politics and to respect the Rule of Law.

II.    **Did the Plaintiff Meet or Exceed the Bare "Notice Pleading" Requirements of Rule 8 To State a Claim for Employment Discrimination Against the Governmental Decision-Maker, Hon. Gregory C. Pittman?**

Plaintiff Responds:    Yes.

To be clear, the County of Muskegon is the only other one of the MMRMA Defendants that is sued

about the discriminatory termination; plaintiff would need to take discovery in order to ascertain

whether any other MMRMA defendant was personally involved.

III.    **Did the Plaintiff Meet or Exceed the Bare "Notice Pleading" Requirements of Rule 8 To State a Claim for Employment Discrimination Against the County of Muskegon, including alleging the County's regular practice and custom (in defiance of its own written policies, which are routinely ignored and circumvented in actual practice) of maintaining a religiously hostile work environment?**

Plaintiff Responds:    Yes.

IV.    **Under <u>Forrester v. White</u>, 484 U.S. 219, 229 (1988), and other controlling authority, is Hon. Gregory Pittman "absolutely immune" from liability for behavior as an *employment decision-maker* (not in any "judicial" capacity at all) to command Plaintiff's unlawful discharge in order (among other things) to erect an economic barrier to Plaintiff hiring a non-Muskegon lawyer to make an appellate record about a corrupt real estate transaction that Pittman engineered?**

Plaintiff Responds:    No.  Of course not.

V.    **Under <u>Camara v. Municipal Court of San Francisco</u>, 387 U.S. 523, 87 S. Ct. 1727 (1967); <u>See v. City of Seattle</u>, 387 U.S. 541, 87 S. Ct. 1737 (1967), and other controlling authority, does the Fourth Amendment apply when Plaintiff makes a written record that Plaintiff does not consent to a physical invasion of Plaintiff's domicile, under color of state law, instigated by a <u>probate</u> court?**

Plaintiff Responds:    Yes, absolutely.

VI.    **Was the law well-settled long prior to the Fourth Amendment civil rights violation, thus precluding any "qualified immunity" defense?**

Plaintiff Responds:    Yes, absolutely. The "contours" of Fourth Amendment jurisprudence have been well-defined for more than 40 years.  If the homeowner (Plaintiff) says in writing "I do not consent, get a warrant," then the government must go to the <u>proper</u> court and get a real warrant, or

change course and consider more reasonable, less-intrusive, options.

**VII.** **Does any Michigan <u>probate</u> court – in a *non-juvenile* case (the domicile is occupied only by adults and their dog) – have any Fourth Amendment warrant jurisdiction to command the <mark>physical invasion</mark> of a private domicile when all owners and occupants unequivocally <mark>do not consent to any invasion</mark> under color of state law?**

Plaintiff Responds:   No.   Jurisdiction over a non-consensual governmental physical invasion of a home, in a non-juvenile case, lies <u>exclusively</u> with Michigan <u>district</u> and <u>circuit</u> courts.[7]   Judge Pittman (not sitting in district or circuit court) acted in the <mark>complete absence of all jurisdiction</mark> by attempting to evade normal ESTATES AND PROTECTED INDIVIDUALS CODE processes.

For purposes of clarification, Plaintiff does not contend that the County of Muskegon is liable, or any judge other than Pittman, for this flagrant civil rights abuse.   Plaintiff does not presently believe that the County itself, or any other judge, has a custom or practice of routinely violating the Fourth Amendment in this way.   The problem, in a nutshell, is that Pittman just makes things up by the seat of the pants and simply does not pay much attention to inconvenient safeguards of personal liberty like the Constitution, the Rule of Law, the COURT RULES, or the ESTATES AND PROTECTED INDIVIDUALS CODE.   Plaintiff is hardly alone in raising concerns about such issues – roughly a half-dozen petitions (only one of which came from the Plaintiff) with the Judicial Tenure Commission also have sought to remedy a variety of real and serious problems over the years.   And yet, problems continue to arise.

---

[7]A very similar issue arose in Ohio in 2015.  <u>See</u> <u>State v. Brown</u>, 142 Ohio St.3d 92, 2015 Ohio 486 (2015).  Typically – as in the case of court-authorized <u>visitors</u> in an adult guardianship (typically, a well-qualified social worker), home access occurs by homeowner <u>consent</u>.  If a homeowner refuses entry to a properly-qualified **visitor**, then one of the Court's options is to refer the matter to the Prosecutor's Office (other non-warrant options also come to mind).  In October, 2014, however, the <u>normal</u> statutory visitor process conspicuously was **not** used, raising a host of entirely reasonable concerns about the plainly political ulterior/pretextual motives and agenda of Pittman and of Republican Party Executive Committee Member Broge.

VIII.   **Is Defendant Pittman "absolutely immune" if the Fourth Amendment violation involved judicial behavior "in the complete absence of all jurisdiction?"**

Plaintiff Responds:    No.

IX.   **Has Plaintiff met or exceeded the Bare "Notice Pleading" Requirements of Rule 8 To State a Section 1983 claim against both Pittman and Committee Member Broge for not only non-consensually physically invading the Plaintiff's home in violation of the Fourth Amendment, but also threatening contempt if all occupants (including dog) did not ==vacate== the premises while the unlawful invasion and two-hour political pretext search was conducted?**

Plaintiff Responds:    Yes.

X.   **Has Plaintiff met or exceeded the bare "notice pleading" requirements of Rule 8 to state a civil rights claim (First Amendment Establishment Clause and Equal Protection) under Section 1983 against the individuals who have been invited to "walk back" the excesses of the Kostrewa investiture in October, 2014, but who instead _all_ unapologetically and deliberately, planned, orchestrated, participated in, and displayed badges of governmental authority at an event over an hour long, that involved Christian Supremacist proselytizing from speaker after speaker, and that actively sought to indoctrinate attorneys and county workers in Dominionist misinformation claiming (falsely, and contrary to the Michigan and U.S. Constitutions that "the judge's power comes from God?"**

Plaintiff responds:    Yes.  The constitutional tort (the same that a pro-se plaintiff asserted in the Jackson County case) has been adequately pleaded.  The Complaint specifically anticipates, and more than amply pleads facts to support, the recently-minted extra "magic words" manufactured by the Sixth Circuit, and therefore satisfies the "coercion" issue, too.

XI.   **Has Plaintiff met or exceeded the bare "notice pleading" requirements of Rule 8 to state a civil rights claim (First Amendment Establishment Clause and Equal Protection) under Section 1983 against the County of Muskegon for the Kostrzewa investiture?**

Plaintiff responds:    Yes.  Plaintiff alleges that this actually reflects the County's (usually more disguised) practice and custom of officially maintaining and promoting Christian Supremacy, and merely represents the mask coming off to reveal what we all knew already.  The County Board's active complicity in concealing and covering up the damning Kotos video, is very strong support that the County is actually antagonistic and hostile to the Establishment Clause, and just grudgingly takes

minor cosmetic actions in an effort to do just what is necessary and no more, usually hoping not to get sued for their hostility to the Rule of Law.

XII. **Did the Kostrzwea investiture have a secular purpose (first prong of <u>Lemon</u> test)?**

Plaintiff responds:   No.  About five minutes of it (the amount of time it takes to mirror a public investiture of a U.S. Supreme Court Justice – watch Kagan's or Sotomayor's public ceremonies on Youtube, for instance) had a legitimate secular purpose.  The rest consisted principally of gratuitous and excessive religious proselytizing.

XIII. **Did the Kostrzewa investiture unconstitutionally and unmistakable endorse and favor religion over non-religion, and the evangelical (indeed, Dominionist and Christian Supremacist) version of Christianity over all other religious perspectives (second prong of <u>Lemon</u>)?**

Plaintiff responds:   Yes.

XIV. **Is it even necessary to do an "entanglement" analysis (third <u>Lemon</u> prong)?**

Plaintiff responds:   No.  The first two prongs, beyond peradventure, make it evident that the "contours" of the constitutional right are well-understlld based on longstanding precedent and that a violation has occurred.

XV. **Is there any historical pedigree to suggest this ceremony should be treated like the ones in <u>Town of Greece v. Galloway</u>, 572 U.S. ___ (2014), or <u>Marsh v. Chambers</u>, 463 U.S. 783 (1983)?**

Plaintiff responds;   No.  For instance, consider (again) the manner in which public investitures of Supreme Court justices are conducted (viewable on Youtube).  The dramatic **departure** from tradition to deliver a Dominionist, proselytizing message, is a key feature that distinguishes this case from <u>Marsh</u> or <u>Galloway</u>.

XVI. **In October 2014, was existing First Amendment law, and its "contours" well enough settled that qualified immunity cannot possibly apply?**

Plaintiff responds:   Yes.  Even under <u>Marsh</u>, were that to apply (it should not), this particular ceremony involved impermissible and opportunistic proselytizing.  The <u>Lemon</u> test and the neutrality test already were firmly explained in literally dozens of precedents.  Thus, even if som question might exist about <u>which</u> test to apply (a regrettable consequence of <u>Marsh</u> being wrongly decided), under any

conceivable constitutional test, this ceremony obviously fails, and shame on a whole room-full of West Michigan judges for just going along to get along.

XVII.   **Are any of the Defendants absolutely immune from injunctive relief and other remedies, seeking to remedy the October, 2014 constitutional violation?**

Plaintiff responds:     No.  Not a one of them was presiding in any contested case.  Judges acting as politicians or preachers are not judges acting in any "judicial" capacity (namely, deciding contested cases).

XVIII.   **Has Plaintiff met or exceeded basic Rule 8 "notice pleading" requirements, to put Judge Pittman on notice of a defamation claim based on Pittman's knowingly false use of court letterhead, for political purposes (to set the stage for Pittman's re-election run in 2018), to "play the race card" by knowingly and intentionally mis-characterizing criticism of Pittman for being an authoritarian bully (and Pittman knew exactly what Plaintiff's basis was for that, and why Plaintiff said what he did) as purportedly "bigoted" or racist?**

Plaintiff responds:     Yes.

XIX.   **Is Pittman absolutely immune from defamation liability for his deliberate and calculated misuse of court letterhead to defame the plaintiff?**

Plaintiff responds:     No.  Quite the contrary, Pittman  misused government resources for political purposes.  His act of defaming the Plaintiff using court letterhead was not "judicial" in the least, and the proper thing for a judge to do is to remain aloof from the 2016 judicial race altogether.

XX.   **Has Plaintiff met or exceeded basic Rule 8 "notice pleading" requirements, to put Defendant Matthew Roberts on notice of a defamation _per se_ claim for Robert's off-the-job political activity (again, all governmental workers are prohibited from engaging in politics on the job) of purporting to "rate" judicial candidates in the media for a non-governmental law firm that had one of its own partners running for judicial office?**

Plaintiff responds:     Yes.  Plaintiff has alleged all the essential elements of the tort.  The communication (by way of a non-governmental press release that was **republished** in the media – thus subjecting media to liability based on the **republication** doctrine) is not privileged.  Accordingly, dismissal is not even arguably possible.

For purposes of clarity, Plaintiff has no recollection whether Roberts even was present or not for the

2014 investiture of Defendant Kostrzewa.  Plaintiff has no present reason to believe that Roberts was

personally involved in the planning or orchestration of the October 2014 First Amendment / Equal Protection Violation, or was anything other than a non-participant audience member.  Plaintiff is **not** alleging that **Roberts** personally engaged in unlawful activity involving the 2014 investiture – and already went over this in detail with Attorney VanderLaan weeks prior to the Muskegon County motion.

XXI. **If Roberts and the five non-government attorneys who all together commit the tort of defamation** *per se*, **all were acting in a non-governmental capacity, under the umbrella of a non-governmental law firm, and Roberts was engaged in** <u>politics</u> **(namely, attempting to rig an election) – which Muskegon County employees are prohibited both by state law and County policy from doing on government time – not appearing in court in any effort to put any particular defendant in jail in any contested case – then was Roberts entitled to absolute prosecutorial immunity?**

> <u>Plaintiff responds:</u>    No.  Of course not.

XXII. **Does Roberts have any "Qualified Immunity" Defense to the Defamation** *per se* **claim?**

> <u>Plaintiff responds:</u>    No.  Defamation is not a civil rights claim, and is not asserted under Section 1983.  Qualified immunity cannot even conceivably apply.

XXIII. **Does Roberts enjoy any state-law immunity?**

> <u>Plaintiff responds:</u>    No.  The GTLA only applies to performing a governmental job, not for engaging in political activity that is prohibited on the job, especially when not on the job in the first place.

## TABLE OF CONTENTS

I.    **The Four Groups of MMRMA Defendants.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II.   **Correction of Some Mis-statements in Defendants' "Statement of Facts."** . . . . . . . . 6

III.  **Defendants' Mis-Interpretation of *Iqbal* is Implausible and Contrary to Settled Law.**
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

IV.   **Plaintiff's Fourth Amendment Claim Against Hon. Gregory Pittman and Vicki Broge**
**is Well-Pleaded, and Not Subject To Dismsisal On Any Immunity Grounds.**
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

V.    **All MMRMA Defendants But Roberts Clearly Violated Well-Known Establishment**
**Clause Princpiles; None of Them Are Immune.**
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

VI.   **Plaintiff has adequately pleaded defamation against Pittman who is not and should not**
**be immune.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

VII.  **Plaintiff Has Satisfied All Notice Pleading Requirements To Allege Defamation *Per Se***
**Against Defendant Matthew Roberts And To Defeat Any Immunity Defense.**
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

VIII. **Roberts is Not Immune.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

IX.   **Forrester v. White Easly Addreses Pittman's Immunity Contention about Employment**
**Discrimination.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

X.    **The Allegations Against The County of Muskegon are Sufficient.** . . . . . . . . . . . . . 20

## TABLE OF AUTHORITIES

[due to time constraints, Plaintiff will re-file an amended brief shortly with the Table of Authorities]

Dated: December 5, 2017.                        Respectfully submitted,

                                                _/s/ Eric C. Grimm_____
                                                Eric C. Grimm (P58990)
                                                ERIC C. GRIMM, PLLC
                                                P.O. Box 1266
                                                1017 West South Street
                                                Alvin, TX  77512-1266

Main: (734) 717-4900
Fax: (888) 502-1291
Email: ecgrimm@umich.edu
Attorney for Plaintiff.

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

---

| | |
|---|---|
| Eric C. Grimm, | |
| Plaintiff, | |
| vs. | Civil Action No. 17-cv-654 |
| Raw Story Media, Inc., The Herald Publishing Company, LLC, MLive Media Group, f/k/a Booth Newspapers, Inc., Newslo, Stephen Kloosterman, Kevin Even, Paul Shibley, Brianna Scott, David Bossenbroek, Matt J. Roberts, David Shafer, Barton Dieters, Gregory C. Pittman, Williams \| Hughes, PLLC, Douglas Hughes, Theodore N. Williams, Jr, Timothy Hicks, William Marietti, Kathy Hoogstra, Robert Carter, Raymond Kostrzewa, Linnea Kostrzewa, Mark T. Boonstra, Neil Mullally, Vicki Broge, and the County of Muskegon, | Hon. Gordon J. Quist United States District Judge  Hon. Philip J. Green United States Magistrate Judge |
| Defendants. | |

---

| | |
|---|---|
| Eric C. Grimm (P58990) | Allan C. Vander Laan (P33893) |
| ERIC C. GRIMM, PLLC | Curt A. Benson (P38891) |
| P.O. Box 1266 | CUMMINGS MCCLOREY DAVIS & ACHO PLC |
| 1017 West South Street | 327 Centennial Plaza Bldg. |
| Alvin, TX  77512-1266 | 2851 Charlevoix Dr., SE |
| Main: (734) 717-4900 | Grand Rapids, MI 49546 |
| Fax: (888) 502-1291 | (616) 975-7470 |
| Email:  ecgrimm@umich.edu | Email:  avanderlaan@cmda-law.com |
| Attorney for Plaintiff. | Attorney for Muskegon County and MMRMA Defendants. |

---

**BRIEF IN SUPPORT OF PLAINTIFF'S OPPOSITION TO MUSKEGON COUNTY /
MMRMA DEFENDANTS' RULE 12 MOTION TO DISMISS**

Plaintiff respectfully opposes the motion of Muskegon County, and several County-related

Page -1-

Defendants, under Rule 12, to dismiss.  As the Issues Presented indicate, lurking in this case is a novel and important constitutional issue, that may be appropriate for appellate certification; timing also may be important due to other appellate activity out of the Sixth Circuit presenting similar but not identical questions.  It is premature for Plaintiff to move for certification, but as a courtesy, the Court is respectfully advised of Plaintiff's views on, and anticipated approach toward, this subject.

Attorney VanderLaan and Plaintiff and have defended several  municipal liability cases together over the years.  The instant lawsuit aside, we have a long-standing personal friendship.  This lawsuit will not change that one way or the other.  The Michigan Municipal Risk Management Authority has a protocol for defense of cases like this one; Plaintiff has prepared dozens of MMRMA memoranda for municipal clients over the years.  In confidential memoranda by defense counsel, sometimes they are privately much more direct (and honestly pessimistic)[8] with clients than the brave face defense counsel present in court, via dismissal motions such as this one.

In court, Plaintiff expects nothing less from Mr. VanderLaan than the most compelling arguments that Mr. VanderLaan is able to muster.  It is inconceivable to the Plaintiff that VanderLaan has done anything less than his <u>absolute best</u> for these clients.  Yet, the arguments made in the Muskegon Defendants' motion are unavoidably weak, to put it charitably.

Why invest time and money (of both sides) on such a filing, and also risk Rule 11 sanctions, if VanderLaan's motion has so little going for it?  Well, first, Plaintiff is not going to seek sanctions

---

[8]Recently, in Grand Rapids, some plaintiffs and their attorneys have managed to get their hands on the confidential assessments of municipal defense counsel (<u>Carl v. Muskegon County</u> and possibly <u>McKinley v. Muskegon County</u> come to mind).  When such memoranda get disclosed, it tends to encourage defense counsel to generate a less-risky (less candid) paper trail in future cases.  Plaintiff intends **not** to seek such memoranda in <u>this</u> case, precisely so as to make sure that counel can feel comfortable telling his clients bluntly about their prospects.

against VanderLaan, here, even if a pretty good Rule 11 argument could be made.  This is because Plaintiff <u>understands</u> that sometimes things must be done to address a client relations imperative – whatever the actual objective merits of the situation might be.  VanderLaan is **not** "the problem" and Plaintiff wants to make that abundantly clear to the Court.

Examining the tea leaves in a way that Judge Quist perhaps is more likely to understand than most readers – sometimes a motion such as what the Muskegon County defendants filed <u>must</u> be lodged with the Court because municipal clients (or one or two especially difficult personalities) simply will not listen to their own lawyer, such that they categorically need to hear it <u>from the judge</u> before a case can be settled on reasonable terms.   An early signal from the Court that a "scorched earth" defense is not in anyone's best interest (least of all, the interest <u>of the public</u> in honest, lawful government and well-functioning courts in Muskegon County) will probably prove more effective than a whole stack of memoranda from even as experienced an attorney as VanderLaan.

I.      **<u>The Four Groups of MMRMA Defendants.</u>**

First, it is helpful to break the County/ MMRMA Defendants into a few groups or categories. These four categories are: (1) Matthew Roberts (who has not been sued for anything in 2014, only July, 2016 – only a single count of defamation *per se*); (2) the County of Muskegon itself (which is sued for a few things – mainly, its custom and practice of <u>pretending</u> pretextually to have a nondiscrimination policy, while <u>actually</u> engaging in systematic religious discrimination and maintaining a religiously hostile work envrionment[9] – but also for playing host to an event in October 2014, at which captive County workers were subjected to over an hour and twenty minutes

---

[9]At the unconstitutional County-hosted ceremony, the County's <u>actual</u> Christian Supremacy custom and practice was on display prominently for all to see in its undisguised, unconcealed form.

of outrageous and unconstitutional religious proselytizing, in violation of the Establishment Clause of the First Amendment and Equal Protection, a clear violation of 42 U.S.C. § 1983); (3) Hon. Gregory C. Pittman (sued for several different things, covered in more detail later in this Brief); and (4) The other judges who **organized** and **scripted** (along with defendants Even, Carter, Linnea Kostrzewa, and others) the outrageous First Amendment and Equal Protection violation that occurred in Judge Hicks's courtroom in October, 2014[10] – and who also, after being confronted directly and diplomatically with the Constitutional violation, doubled-down by refusing to apologize or to walk it back in any fashion, whatsoever).

The MMRMA Defendants' motion pretends to suffer from confusion about the different counts and defendants, which is disingenuous in the extreme because Plaintiff already has clarified this for Mr. Vanderlaan, and is always reachable by telephone to clear things up if _real_ confusion exists. And the actual breakdown is trivially simple. For instance, the Fourth Amendment civil

---

[10]Immediately after the ceremony, at the reception, Plaintiff was able to achieve a breakthrough with at least one friend and fellow Rotarian, Orville Crain. Orville, feeling very gratified to have his personal religious sensibilities massaged for over an hour, decided to repeat a behavior he had exhibited in the past – poking at or mocking the Plaintiff by wishing him a "Merry Christmas" (in October). Plaintiff then asked Mr. Crain, "What if you were a black man, a lawyer, and went to a government event, at which nearly all the judges in your county – the people presiding over cases in which you are representing clients – appeared in minstrel outfits and blackface, and spent over an hour repeating the n-word over and over again, with barely a sentence that was not intended to marginalize everyone who is not European? How would you feel if, at the following reception a friend then came up to you and offered what you recognized as a Klan secret handshake?" Crain was taken aback to realize that different people have very different perspectives about such a ceremony and the intended discriminatory message, see Santa Fe Independent School District v. Doe, 530 U.S. 290 (2000) (quoting Lynch v. Donnelly, 465 U.S. 668, 688 (1984) (O'Connor, J., concurring) (Government "sponsorship of a religious message is impermissible because it sends the ancillary message to members of the audience who are nonadherents 'that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community.'"). A few days later, Crain sincerely apologized and expressed remorse for so badly failing to "get it" until so confronted.

Page -4-

rights claim is asserted against Defendant Pittman, and a non-MMRMA Defendant named Vicki Broge (at the time an Executive Committee member of the same political party to which Pittman belongs); it does not apply to the County or the other MMRMA Defendants.  As for defamation, a state-law cause of action (not subject to civil rights immunity doctrines), there are two different communications that are subject to two different counts.  Matthew Roberts (alone among the MMRMA Defendants) participated in a phony "peer-review"panel engineered by Muskegon's notorious Nolan law firm – which had a firm member running for judicial office.  The fake panel domestically manufactured defamatory "fake news" in an election cycle filled with "fake news" (some from foreign origins), in an effort to rig the local election to favor attorneys willing to do things the Nolan way.  Regrettably for the voting public, they succeeded.

Plaintiff has alleged a defamation *per se* count against Roberts and what Jonathin Swift (or John Kennedy Toole) might characterize as the non-MMRMA "Confederacy of Dunces" who took a public stand for public corruption, in an unmistakable way.  Roberts is not sued for anything else.

Plaintiff would argue (a good faith argument for the common-law extension of existing law) that falsely and with malice labeling someone in the press, as a "bigot" when they are anything but, ought to be added in the 21st Century to the list of categories recognized as defamation *per se*.  In this day and age, it certainly is more likely to produce a "cyber lynch mob" than – say – falsely impuging any modern adult's reputation for chastity.  See David Pogue, *Internet shaming: When mob justice goes virtual*, CBS NEWS (August 20, 2017), < https://www.cbsnews.com/news/internet-shaming-when-mob-justice-goes-virtual/ >.  This phenomenon is an Internet-connected amplification of the "two minutes hate" out of Orewll's 1984.

Unless the law changes and evolves to keep up with social progress, however, Michigan law

would appear to treat the "bigo[t]" calumny and knowing falsehood as defamation *per quod*, thus requiring special damages to be alleged.  Plaintiff has, in fact, gone above and beyond the bare requirements of notice pleading to allege special damages from the defamatory calumnies that Defendant Pittman (acting as a **politician** and pre-emptively using public resources to rig the **2018** election cycle in his own favor by pre-emptively "playing the race card," not as a judge at all) first published on court stationary, and that several non-MMRMA defendants then republished in what amounts to a modern-day "cyber lynch mob" feeding frenzy.  No other MMRMA Defendant is being sued for Pittman's defamation.  Rather, MLive and others are being sued for republishing an horrendous falsehood and calumny that both Stephen Kloosterman and MLive actually knew in advance and had every reason to know, was categorically defamatory at the time they republished.

Pittman and the County of Muskegon (along with some non-MMRMA defendants) have been given fair notice through "notice pleading" of civil rights (section 1983), Title VII and hostile work environment claims, based on unlawful religious discrimination, and the wrongful decision to direct the termination of plaintiff's employment by a governmental, captive, law firm).

Pittman is also included among the orchestrators / hosts, who organized, spoke at, and performed (as opposed to merely sitting passively in the audience) the troubling and unconstitutional ceremony (the Kostrzewa investiture) in the County Courthouse in October, 2014.  The County is included, too, as a Defendant on this Count.  Roberts (audience member, at most) is not.

A few additional points make sense under the circumstances, primarily because the question of **why** things have gone so far off the rails in Muskegon County, is just as likely to occur to the Court, as it has to the Plaintiff.  In order to understand <u>why</u>, one needs to go back decades before this case arose, and appreciate that Muskegon County is like a sieve.  It has been screening residents

(especially lawyers) for years.  Those who are "just fine" with local corruption and the Muskegon way of doing things (especially the local notion that laws are for other people) are welcome to stay.

Those who insist that laws apply uniformly to everyone, or the Rule of Law trumps the Divine, Arbitrary, Authority of Judges, are (with escalating severity, if they don't take the hint the first time) made uncomfortable until they leave.  Continue stockpiling chaff/goats while expelling wheat/sheep, for decades, systematically, and the results ought to be predictable.

## II.    **Correction of Some Mis-statements in Defendants' "Statement of Facts."**

Plaintiff is not, as MMRMA Defendants claim, a "Muskegon" attorney.  Plaintiff left Muskegon at 18 on a National Merit Scholarship, for Houston, Texas.  Plaintiff became a Texas attorney in 1993, and remains one.  He did join the Michigan Bar five years later, 1988 – but did no legal work in Muskegon until Plaintiff's father (a district court judge) was dying of cancer, and Plaintiff returned home in an effort to protect his mother from harm[11] in December 2006.  The very institutions that were supposed to help protect her from harm turned out, instead, to be predatory.

Rumor had it, upon Plaintiff's return, that Plaintiff wanted to "ride his father's coat-tails" into judicial office.  Nonsense.  If judicial office in Muskegon County were Plaintiff's lifetime ambition, then after joining the City Council in Roosevelt Park in 2008 (at the urging of Mr. Stapleton, now representing Mr. Hughes as defense counsel), why would Plaintiff follow his conscience and "make waves" about religion and government (that started making headlines in 2009)?  Aspiring judicial candidates in this county, at least genuine aspirants, are far cagier. Plaintiff did not seek any such office until 2016 (having ignored the begging of many attorneys in

---

[11]The more detailed narrative about Plaintiff's concerns is found in the affidavit from the motion Plaintiff filed seeking to disqualify Judge Pittman (Pittman did disqualify himself, but for other reasons).  See **Exhibit Two** (Affidavit supporting motion to disqualify).

2012 for Plaintiff to unseat Pittman) – and Plaintiff's **real** objectives in 2016 were (1) to force Pittman to disqualify himself from continuing to hold Martha Grimm hostage (mission accomplished – the State Court Administrative Office has reassigned the case to an out-of-county judge), and (2) to advocate for the idea of more "out" openly nonreligious candidates running for offices at all levels of government.  The "path of least resistance" in October, 2014 and afterward, if Plaintiff had actually wanted to become a judge, would have been – well – just what all the judges in the County were expressly urging from the benchpulpit during Kostrzewa's investiture – namely, staging a fake and very public "conversion" to Christianity (maybe even with a change in party affiliation), and then praying on bended knee in supplication to the Almighty, for donors to line up around the block to pay for the campaign.  After all, in Muskegon County, quite often very public displays of religiosity serve as a kind of signal that one has a high tolerance for corruption, and is willing to play make-believe for the sake of appearances, when expedient.  Plaintiff has no interest in being **that** kind of judge, ever, under any circumstances, thanks.

III.    **Defendants' Mis-Interpretation of *Iqbal* is Implausible and Contrary to Settled Law.**

As for Defendants' Rule 12 motion, even after the Iqbal decision, the standard for overcoming such a motion still involves the basic principles of "notice pleading" under Rule 8. Plaintiff has been considering whether to seek leave to amend, to add a RICO count against some (not all) Defendants.  The Statute of Limitations still has not expired.  But, so long as RICO remains out of the case, then Rule 9(b) clearly does not impose any heightened particularity or "heightened pleading" requirement.  Accordingly, the level of detail that Plaintiff has provided in the Complaint, is far more than necessary to provide the bare "fair notice" Rule 8 contemplates.

Plaintiff has alleged all essential elements of every count alleged, against each of the

Defendants.  There is no basis, here, to dismiss the case or any count at the pleadings stage, even before discovery can be taken.  Plainitiff can understand why County Defendants each may be reluctant about being required potentially to admit the allegations in the First Amended Complaint in whole or in part – in a public document, no less.  And even more uncomfortable about the prospect of Plaintiff securing key evidence that is known to exist, through discovery.  That may be anxiety-provoking in a lot of ways.  But the reality is, a 12(b)(6) motion only delays the inevitable.

MMRMA Defendants – mis-understanding and mis-interpreting Iqbal in much the same way that Ken Ham of Kentucky's Creation Museum plays deceptive word games with the word "theory"[12] – mistakenly invite this honorable Court to engage in impermissible fact-finding, indulging what amounts to selective disbelief of factual allegations in the First Amended Complaint.

Colloquially speaking, it may or may not be "implausible" for a RICO enterprise – namely, a real estate and other asset liquidation mill – to operate surreptitiously through a probate court[13]

---

[12]Specifically, Mr. Ham and others deliberately attempt, rhetorically, to confuse the colloquial sense of "theory" (meaning speculation or conjecture) with the meaning of the word in relation to a scientific "theory" (meaning a rigorous explanation of a phenomenon – such as the General Theory of Relativity, about the mathematical curvature of spacetime, that explains the phenomenon of gravitation – that has been confirmed by abundant experimental evidence and data). A very conservative, personally religious judge, John E. Jones, III, of the Western District of Pensylvania, in the post-trial decision in Kitzmiller v. Dover Area School District, 400 F. Supp. 2d 707, 716-21, 725 (W.D. Pa. 2005) (squarely rejecting school district's attempt to "teach the controversy" about the pseudo-science notion of "intelligent design"), did a fairly decent job of discussing the stark difference between a scientific "theory" worthy of that name, and the word games played by (often religious) anti-evolution and anti-education advocates like Ham.

[13]Plaintiff was happy to learn that one of his favorite judges, Hon. Gary Feess in Los Angeles (who presided over a dispute Plaintiff handled against actor Kevin Spacey, about the Internet address KevinSpacey.com), recently ruled that the Los Angeles Police Department can be sued as a RICO "Enterprise."  Amending to add RICO is looking more and more appealing all the time. A voluntary settlement, of course, can include a global release by the Plaintiff, protecting Muskegon County and its courts against further civil claims by the Plaintiff, under

(continued...)

(the Department of Justice Manual for RICO prosecutions, however, does identify "courts" as one of the categories of legal entities, through which those engaging in a "pattern" of predicate offenses can wind up prosecuted or sued under the statute).  But in a <u>legal</u>, <u>Iqbal</u>, sense, the Court is prohibited from merely noting the disparity between what courts <u>normally</u> do, or personal experience, and the alleged behavior of Defendants in <u>this</u> case, followed by arbitrarily discounting allegations that something is deeply wrong and sinister with this **particular** courthouse, as purportedly "implausible" merely because of the divergence between expectations and allegations.  In a <u>technical</u> sense, the allegations are not "implausible" in the least – and presupposing, essentially, the "King can do no wrong" legal <u>fiction</u> about courts and court personnel, such that any departure from model behavior (which departures, in reality, are far too common and <u>entirely</u> "plausible") could never be addressed or redressed, by any civil rights lawsuit, ever.  Obviously, that is a wrong interpretation and not the intention of <u>Iqbal</u>.

In short, Defendants' word-play proves too much.  It is colloquially "implausible"  for probate and juvenile judges in Pennsylvania to engage in a "cash for kids" bribery racket, thereby inflating revenues of a private detention facility by inflating conviction rates and the length of sentences – because <u>ordinarily</u> state courts are not supposed to work that way.  But no federal court can dismiss a case like <u>United States v.  Ciavarella</u>, 716 F.3d 705 (3rd Cir. 2013), merely because is it almost shocking that any person with a law license and a judicial career would ever dream of doing that to other human beings.  Likewise, it may be "implausible" in a <u>colloquial</u> sense, but certainly **<u>not</u>** in a technical <u>Iqbal</u> sense, for a multitude of California judges to operate an Orange

---

[13](...continued)
RICO or otherwise.

County ticket-fixing racket.   <u>See</u> Courtnews, *California Judicial Council Blamed for Court Corruption Epidemic*, CNN iReport (July 25, 2015) (referencing "A string of court corruption scandals in California - including a ticket fixing scheme uncovered by the FBI in Orange County and an alleged racketeering organization in Sacramento County."). Is Michigan immune? <u>Especially</u> Michigan's probate courts since 1988 have <u>repeatedly</u> gone unattended and un-fixed, despite unmistakable klaxon calls that systemic, statewide, problems exist and require attention. <u>See</u> **Exhibit One** (Applications filed with Michigan Supreme Court, collecting sources identifying a systemic problem that repeatedly has gone unaddressed); <u>see also</u> Rachel Aviv, *How The Elderly Lose Their Rights*, THE NEW YORKER (October 9, 2017) (yet another of the growing litany of press reports identifying an epidemic of corruption in many probate courts). Heather Catallo of Michigan's WXYZ is currently working on a long series of reports about abuses in Michigan's probate court system. Assurances by Attorney General Bill Schuette that these abuses involve only isolated "bad apples" ring hollow as initial dismissive pronouncements about Lead in Flint.

IV.    **Plaintiff's Fourth Amendment Claim Against Hon. Gregory Pittman and Vicki Broge <u>is Well-Pleaded, and Not Subject To Dismsisal On Any Immunity Grounds.</u>**

In a **<u>guardianship</u>** proceeding in Michigan, there is a procedure for a **<u>visitor</u>** to be appointed to do a home evaluation – typically a well-qualified LMSW. In 2012, such a visitor did visit Plaintiff's home – and was greeted warmly, before a nice chat both with the Plaintiff and the Protected Individual ("PI"). This resulted in a glowing report, finding the Plaintiff's home perfectly suitable for the PI. Over a dozen other nursing and social work professionals between 2012 and 2014 came to the identical conclusion. In 2014, Judge Pittman was frustrated that a prior (2012) attempt (using the **<u>exact same</u>** real estate agent, Lou Bulthouse) to liquidate the home that the PI owned overlooking the lake in North Muskegon – at a 50% discount (to the PI's detriment) had been

thwarted by the Plaintiff.  In 2014, Judge Pittman was doubly frustrated that Plaintiff (as PI's lawfully-appointed conservator) elected to use a better real estate agent (Vivan Keene) than Pittman's preference, Bulthouse.  So, an elaborate contrivance was engineered to provoke the Plaintiff into objecting in writing on Fourth Amendment grounds to Pittman's attempt to introduce a <u>political</u> ally (Vicki Broge of the Executive Committee of the local Republican Party – same party as Pittman) into Plaintiff's home on a pretext, **rather than** any legit LMSW visitor.  Based on well-settled law for over 40 years, the Fourth Amendment absolutely **is** a valid basis to refuse consent to Broge's entry (and also to the compound invasion of commanding occupants and their dog to vacate the premises while the pretext search was conducted).  <u>Camara v. Municipal Court of San Francisco</u>, 387 U.S. 523, 87 S. Ct. 1727 (1967); <u>See v. City of Seattle</u>, 387 U.S. 541, 87 S. Ct. 1737 (1967).  Especially concerning physical invasions, **no means no**.  <u>Id.</u>

A friend of Plaintiff (now a federal government trial attorney) has summarized, in a well-written brief, why the sanctity and privacy of a person's home, is sacrosant in the law:

> The home has long enjoyed significant protection as a private place.  According to William Blackstone, the law has "so particular and tender a regard to the immunity of a man's house that it stiles it his castle, and will never suffer it to be violated with impunity."[14]   William Pitt declared: "The poorest man may in his cottage bid defiance to the Crown.  It may be frail – its roof may shake – the wind may enter – the rain may enter – but the King of England cannot enter – all his force dare not cross the threshold of the ruined tenement!"[15]

> In the US, the importance of privacy in the home has long been recognized. As far back as 1886, the Supreme Court recognized the importance of protecting "the sanctity of a man's home." <u>Boyd v. United States</u>, 116 U.S. 616, 630 (1886).  As the Court later observed in <u>Payton v. NY</u>, 445 U.S. 573, 589 (1980), "In none is the zone

---

[14] COMMENTARIES ON THE LAWS OF ENGLAND, 4 WILLIAM BLACKSTONE, *223 (1765-1769).

[15] CHARLES J. SYKES, THE END OF PRIVACY 83 (1999).

of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home. . . ."[16]  As recently as <u>Kyllo v. United States</u>, 533 U.S. 27 (2001), the Court ruled that a person's home is such a core component of the right to privacy that the government may not use technological, but physically non-invasive, means to intrude there.

The whole purpose of the engineered physical intrusion was to be deliberately and insultingly provocative – to communicate an intended message that Judge Pittman is God in His Courtroom (a theocratic tyrant) and that **<u>no boundaries exist</u>** (even those long recognized at law) – that Plaintiff should (here's that concept again) be reduced to a base supplicant on his knees before the Almighty narcissistic ego of Pitttman – or else "We're" gong to mess with the Protected Individual some more.

There is no possibility of a qualified immunity defense to liability for this egregious and outrageous physical intrusion – the invasion of a tyrant into Plaintiff's home for no purpose other than to communicate that the law des not really apply in Muskegon County and there will be no rules until Plaintiff leaves Michigan and stops causing trouble.

The <u>actual</u> law (which we presuppose <u>federal</u> courts, at least, are duty-bound to follow) is simply this and has been so for over 40 years: By refusing consent, Plaintiff forces the government to obtain a warrant before entering (Pittman and Broge did not), and if the government fails to do so, then the violators of the Fourth Amendment proceed at their own peril when invading the premises in defiance of the well-established contours of 42 U.S.C. 1983, and the Fourth

---

[16]See also <u>Silverman v. United States</u>, 365 U.S. 505, 511 (1961) ("At the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion'); <u>Shulman v. Group W Productions</u>, 18 Cal. 4th 200, 230-31 (1988) [emphasis added] ("the tort of intrusion into private places, conversations or matter is perhaps the one that best captures the common understanding of 'invasion of privacy.' It encompasses unconsented-to physical intrusion into the home . . . or other place the privacy of which is legally recognized, as well as unwarranted sensory intrusions such as eavesdropping, wiretapping, and visual or photographic spying . . . . **"He who may intrude upon another at will is the master of the other and, in fact, intrusion is a primary weapon of the tyrant.'"**).

Amendment.  <u>Camara</u>; <u>See</u>; <u>see also</u> <u>Filarsky v. Delia</u>, __ U.S. __; 132 S. Ct. 1657 (2012).

Pitman argues he is entitled to "absolute immunity" because he is a judge.  As MMRMA defendants <u>all</u> concede, however, there is an exception to judicial immunity:  When a judge engages in conduct beyond the jurisdiction of that particular court (say, a probate court judge purporting to authorize physical entry of a home).  <u>See</u> <u>State v. Brown</u>, 142 Ohio St.3d 92, 2015 Ohio 486 (2015).

Probate courts in Michigan do not have authority or jurisdiction (as District or Circuit courts would) to issue search warrants – especially not in an adult conservatorship (the guardianship, relating to management over the PI's living arrangements was <u>not involved</u> in the Broge affair in any manner whatsoever – and hence, even "visitor" authorization is not hypothetically available as a rationale).  The home that was invaded was **<u>not</u>** then a conservatorship financial asset.

Under the entire ESTATES AND PROTECTED INDIVIDUALS CODE, jurisdiction of a probate court to issue <u>any</u> warrant (let alone a search warrant) is limited to exactly one specific subsection – namely MCL 700.1205(2), relating to "Discovery and remedies for fraud, embezzlement, conversion, or withholding of assets."  Section 700.1205(2) conditions the issuance of a warrant *ad testificandum*, upon a refusal to obey a prior order directing disclosure of certain information.  At no time ever, while any Martha Grimm EPIC case was under Judge Pittman's dominion, was any even colorable allegation (let alone any accusation supported by "oath or affirmation") made suggesting any such thing ever was done by the Plainiff.  Thus, that section cannot apply.  Chapter 5 of the Michigan Court Rules (Probate Courts) and any sections of the REVISED JUDICATURE ACT relating to probate courts also do not supply jurisdiction for a probate court to issue search warrants.

In short, the precise reason that **<u>this</u>** violation has become a count in a civil rights lawsuit (as opposed to a myriad of other violations of statutory mandates by Pittman left unaddressed in the

state court system) is because Plaintiff agrees that **jurisdiction** matters.  Judge Pittman's scheme

to invade the Plaintiff's home (and Plaintiff put his lack of consent **in writing**) crossed the line into

conduct taken "in the absence of all jurisdiciton," and that makes all the difference.  No immunity.

V.      **All MMRMA Defendants But Roberts Clearly Violated Well-Known Establishment Clause Princpiles, and None of Them Are Immune.**

We appreciate how MMRMA Defendants all concede that <u>Lemon v. Kurtzman</u> (including

the "Endorsement" test developed by Judge O'Connor in <u>Lynch v. Donnelly</u>), supplies the

applicable legal standard.  Others might have contended (despite the lack of any historic pedigree

relating to judicial ceremonies) that this should really be treated as a <u>Marsh v. Chambers</u> situation.

That argument would be wrong, yet it would not be surprising to see it made.

The bottom line is this:  "Absolute immunity" does not extend to judges acting as <u>politicians</u>

(even in a courtroom) by pandering shamelessly to the 30% of the population (what professor Robert

Altemeyer would term "authoritarian followers") who pay close attention to prayer and symbolism,

and become quite agitated without enough religion surrounding them.   To enjoy "absolute

immunity" a judge must perform a <u>judicial</u> function – principally, deciding contested cases.

What went on in the County Building at Kostrzewa's investiture had nothing to do with

fulfilling necessary judicial functions; at best, the MMRMA Defendants (not Roberts – who was

passive inthe audience, at most) were acting in an administrative or merely ceremonial capacity.

Judges should know how to maintain both actual impartiality, and the <u>appearance</u> of it, and

flagrant favoritism (in violation of the "Endorsement test") toward the most extreme from of

authoritarian Christianity,[17] is **not** impartial.  Pandering on religious grounds and alienating all non-

---

[17]These Defendants claim to want more detail about what, precisely, occurred.  This is
(continued...)

adherents is <u>not</u> a "function" of any lawfully-run court that needs to be shielded at all; it is squarely contrary to Judicial ethical canons that caution against discrimination.

The public interest is served by making sure that **<u>judges</u>** of all people, know not to be overtly discriminatory against non-Christians in their public behaviors.   Immunity clearly does not apply.

## VI. **Plaintiff has adequately pleaded defamation against Pittman who is not and should not be immune.**

Defamation is a state-law tort, not a civil rights action.  <u>Stump v. Sparkman</u>, and other civil rights precedents, have no application.  Judge Pittman essentially argues that GTLA immunity for judges should be transformed from a <u>shield</u> (to protect from lawsuits by litigants targeting <u>decisions</u> the judge has made <u>from the Bench</u> in contested cases, and actions in the courtroom), into a **<u>sword</u>** to be used arbitrarily to bully perceived and actual political rivals and critics into submission.

Plaintiff – entirely justifiably – criticized Judge Pittman for being an authoriatarian bully. Which Pittman is (and he is thin-skinned about it, to boot).  Any judge behaving the same way (and judges who look like Pittman are no more common in the academic literature about judicial bullying than any other judges) would have received the same criticism.  Because someone needs to stand

---

[17](...continued)
disingenuous, and frankly insulting, for several reasons.  First, <u>notice</u> pleading requires no more. Second, Plaintiff already has provided a very detailed account of the event to these exact same Defendants.  For convenience, that is attached as **Exhibit Three** (and now will be in the appellate record if the Establishment Clause issue needs to go up on appeal, at the pleadings stage, by certification or otherwise).  Third, these self-same Defendants are **personally to blame** for **<u>not</u>** providing a videotape that Plaintiff could have attached to the amended Complaint – and that Plaintiff has been seeking repeatedly, in writing, only to be stonewalled.  See **Exhibit Four** (Correspondence with Chief Judge Marietti); **Exhibit Five** (Correspondence with County Board).  Also attached as **Exhibit Six** is email correspondence with Kimon Kotos, the videographer who captured the whole event, and with Judge Kostrzewa.  Demanding granular detail, and then withholding the very means to fulfill that demand until compelled to produce it in discovery, is merely calculated to antagonize, an argument made in deliberate bad faith, and yet another form of typical Muskegon bullying.

up to the bully, in order to bring relief to all those who are afraid to stand up.

The paragraph in question used the word "bully" itself multiple times, to make clear and unambiguous exactly what the intended meaning was.  Pittman then attempted to exercise a "heckler's veto" by **pretending to hear a dog whistle that was never there**, and then "playing the race card" in order to **deflect** attention from the truth (the truth that he is a bully who needs to be removed from office), rather than reflecting on problems with his own behavior (that is harming people every day in this courthouse).  What he argues is that behavior that would be clearly improper and defamatory if published it where it belongs – on political campaign committee letterhead – instead is subject to an unlimited privilege to lie and defame with impunity merely because he chooses to practice politics on official court stationary, rather than campaign stationary.

That misconduct ought not to be rewarded.  The very fact that Pittman chose to abuse official stationary to write his letter is all the stronger reason why immunity must be denied (Michigan law and Judicial Canons prohibit such use of office for political advantage).  Immunity in this circumstance would be directly contrary to public purposes that the statute is designed to promote.

## VII.   Plaintiff Has Satisfied All Notice Pleading Requirements To Allege Defamation *Per Se* Against Defendant Matthew Roberts And To Defeat Any Immunity Defense.

Plaintiff has more than adequately alleged facts in the Amended Complaint to state a claim that Defendant Matthew Roberts, commit the tort of defamation *per se*, in July 2016.  Defamation is either *per se* or *per quod* – and there is no factual dispute that Roberts, along with five other (non-government) attorneys acting at the behest of Muskegon's notorious (but totally non-governmental) Nolan law firm to rig the 2016 election (i.e., to get a member of the Nolan firm elected, and to make certain no uninfluenced / uninfluencable judges are elected) – on the eve of the August 2016 primary, savagely and with malice attacked the Plaintiff's reputation **in Plaintiff's profession**.  A

communication is defamatory if, considering all the circumstances, it tends to so harm the reputation of an individual as to lower that individual's reputation in the community or deter third persons from associating or dealing with that individual.  <u>Hawkins v. Mercy Health Services, Inc.</u>, 230 Mich.App. 315, 324, 583 N.W.2d 725 (1998).   Slander (libel) *per se* exists where the words spoken (written) are false and malicious **and are injurious to a person in that person's profession or employment**.  <u>Glazer v Lamkin</u>, 201 Mich App 432, 438; 506 NW2d 570 (1993).  Michigan also recognizes the tort of defamation-by-implication.   <u>Hawkins</u>, 230 Mich. App. 315, 583 N.W.2d 725.

Deliberately and with malice downrating a well-qualified attorney (creating the false implication that the attorney is a bad attorney who delivers <u>the worst possible service</u>), in order to prefer easily-influenced judicial candidates over the candidate that is well-qualified (the only candidate that had prior experience as a federal law clerk, for instance) and who is insistent on actual fairness and impartiality, is the very essence of injury to "a person" (namely, Plaintiff), **in his profession or employment**.

"Words are defamatory *per se* if they, 'by themselves, and as such, without reference to extrinsic proof, injure the reputation of the person to whom they are applied." <u>Yono v. Carlson</u>, 770 N.W.2d 400, 402 (Mich. Ct. App. 2009) (citing BLACK'S LAW DICTIONARY (6th ed), p 417).  When "there is defamation *per se*, the **presumption of general damages** is well settled."  <u>Id.</u> (citing <u>Burden v Elias Bros Big Boy Restaurants</u>, 240 Mich. App. 723, 728; 613 N.W.2d 378 (2000)).  Such a false, unsubstantiated, and implausible attack on the Plaintiff <u>in Plaintiff's profession</u>, as a matter of law in Michigan, constitutes defamation *per se*, and is actionable.

Defamation is not subject to the "heightened pleading" requirements under Rule 9(b) that apply, for instance, to *scienter* allegations in a fraud case.  "Malice, intent, knowledge, and other

conditions of a person's mind may be alleged generally"  FED. R. CIV. P. 9(b).  Plaintiff expressly

alleges falsehood by Roberts, underline knowing falsehood, and actual malice on Roberts's part.  Plaintiff also

alleges (and there is no factual dispute) that Roberts was timely offered in writing the opportunity

to retract his calumny, and Roberts failed to do so.  Thus, Plaintiff has given "fair notice" to Roberts

of the nature of the defamation *per se* claim as required by Rules 8 and 12.

## VIII.   <u>Roberts is Not Immune.</u>

The argument that Roberts is somehow protected by Michigan's Government Tort Claims

Act from liability for engaging in political defamation *per se*, while not actually working and while

not in court on a contested case, is akin to arguing the statute protects him from liability for torts that

he commits while at home on the weekend, not working.  Absurd.  MCL 691.1407(5) only applies

when a prosecutor, judge, or elected official "is acting within the scope of his or her judicial,

legislative, or executive authority."  It is forbidden by law for Roberts to endorse or trash political

candidates as part of his job . The allegations against Roberts are not based on any civil rights statute

such as Section 1983, so all arguments made about qualified immunity, or absolute immunity that

prosecutors enjoy while they are <u>prosecuting specific cases in front of a judge</u> (investigation, even

when on the job is not enough),[18] are not germane.  Roberts is, accordingly, not immune.

## IX.   <u>Forrester v. White Easly Addresses Pittman's Immunity Contention about Employment Discrimination.</u>

Plaintiff already explained to Judge Pittman that there is no basis for dismissal of the

---

[18]Often, prosecutors' employment duties go beyond the strictly prosecutorial to include investigation, and when they do nonprosecutorial work they lose their absolute immunity and have only the immunity, called "qualified," that other investigators enjoy when engaged in such work. <u>Buckley v. Fitzsimmons</u>, 509 U.S. 259, 275-76 (1993); <u>see also</u> <u>Fields v. Wharrie</u>, 740 F.3d 1107 (7th Cir. 2014) (expanding recognized exceptions to prosecutorial immunity).

employment discrimination claims that Plaintiff has intended to bring since early 2016.   <u>See</u> **Exhibit Two** (Affidavit to Disqualification Motion).   That Pittman would continue making arguments that he knows are directly contrary to settled law – namely,  <u>Forrester v. White</u>, 484 U.S. 219, 229 (1988), suggests a measure of bad faith, and makes a Rule 11 motion very tempting. However, Plaintiff shall just turn the other cheek for the present and point out – again – that all the essential elements have been supported with factual allegations and that firing somebody merely because they hire a lawyer to make an appellate record to disrupt your religiously-motivated (and likely RICO-violative) scheme to "send a message" and put a stop to advocacy for religious equality, is a flagrant civil rights violation.

X.    **<u>The Allegations Against The County of Muskegon are Sufficient.</u>**

The County of Muskegon is not being sued for the off-duty behavior (defamation *per se*) of Mr. Roberts.  It is being sued for maintaining a religiously hostile work environment (an oppressive environment of Christian Suprmacy) throughout the courthouse, in the Office of County Corporate Counsel (which moved back and forth, at the County's convenience, between an in-house situation and a captive law firm), at County Board meetings, in the Public Works department (where the current County Administrator used to carry out his religious agenda), at the Muskegon Area Transit System, in the Health Department, the County Jail, the Sheriff's Department, the courts, and in many other specific agencies and branches of county government.

Muskegon has a written personnel policy that prohibits sex discrimination or maintaining a sexually hosting work environment.  But that did not stop the Justice Department from suing (and securing a Consent Decree) in <u>Amaya v. County of Muskegon</u> because the County's actual practices and customs hardly matched its paper policy.  Likewise, with respect to religious equality and

inclusion, Muskegon County's actual pervasive customs and practices make a complete mockery of the written policies that lawyers have dutifully copied from form books for someone to put on a shelf and ignore.

The County's actual Christian Supremacist culture, practices, and customs, were on full display at the Kostrzewa investiture. To lend emphasis to where the County Board's heart and allegiance truly are directed(certainly not toward adherence to the requirements of the Constitution), both the County Chair of the Democratic Party (Robert Carter – former Sheriff and a West Michigan religious "traditionalist," Right-to-Life, Democrat) and of the Republican Party (Kevin Even) were present to emphasize that there is no real room or acceptance of non-Christians in the County – just in case the 70% of the population that belong to no religious congregation ever started to get queer notions about religious equality in their heads. The short version is the First Amended Complaint already contains ample detail, and allegations to cover all the elements of the civil rights cause of action both for employment discrimination against the County, and for the Hostile Work Environment claim.

It has been contended by some Defendants (not necessarily the County) that the Williams | Hughes law firm was not an arm of the County itself, but more similar to the (clearly non-governmental) Nolan Law Firm. Plaintiff respectfully responds that it is more complicated than that, and discovery should be taken (especially to show that the revenue on which the law firm depends overwhelmingly comes from Muskegon County, and that Corporate Counsel has moved at the County's convenience on and off of the county payroll at different times, historically). The Sixth Circuit has held that even an outside law firm representing a municipality may claim a qualified immunity defense when working for a municipal client, even though employed technically by a

"private" employer.  <u>Cullinan v. Abramson</u>, 128 F.3d 301, 310 (6th Cir. 1997); <u>see also</u> <u>Filarsky v.</u> <u>Delia</u>, __ U.S. __; 132 S. Ct. 1657 (2012).  Simply put, the County and the law firm cannot have it both ways.  If the decision-maker is actually a county probate judge, and the firm is a captive (and merely ministerial, obedient) arm of the County, then the County is responsible for the employment discrimination.  In short, the allegations are sufficient at least to allow the case to proceed to the discovery and fact-development stage.

Respectfully submitted,

December 5, 2017                                      ___/s/ Eric C. Grimm_____
                                                                  Eric C. Grimm (P58990)
                                                                  ERIC C. GRIMM, PLLC
                                                                  P.O. Box 1266
                                                                  1017 West South Street
                                                                  Alvin, TX  77511
                                                                  Main: (734) 717-4900
                                                                  Fax: (888) 502-1291
                                                                  Email:  ecgrimm@umich.edu
                                                                  Attorney for Plaintiff.