# Fwd: Probate court chart / bio. Understanding some of the nuance of the probate court race.

July 10, 2016 at 9:35 PM

To  19 recipients

**This all might be of interest to you.**

Dear friends and colleagues:

1. There's a tradition in Muskegon County. On top of learning "judging" by -- in effect, learning to swim through being thrown to the pool without water wings -- our local judges also most often assign the job of Chief Judge to the newest, least-experienced member of each court. Bill Marietti, at least temporarily, has volunteered to take on the Chief Judge role despite his years of service, and deserves to be recognized for his dedication. But that is unusual. Typically, our senior judges attempt to make their own lives easier, even though service to the public might be a better guiding principle.

How long is it, exactly, before Judge Marietti retires? I hear rumors (perhaps just that, perhaps not), that it may not be very long before he steps down -- not a full six years. Perhaps as few as two years (almost certainly less than two if he wants to be confident a Republican will appoint his successor -- a little longer if his preference has shifted toward the Democratic Party).

Some judicial candidates propagate the seemingly plausible notion that experience arguing cases as an advocate is great preparation for deciding cases and presiding as a judge.

It isn't.

The two skill sets differ considerably.

Of the nine candidates running for two contested offices, I'm the only one who can compare a judge's perspective behind the bench, with an advocate's perspective in front of it. The cases made by every of the other candidates on that score, are . . . unpersuasive.

The attached information ( a comparison chart and a bio) may be of interest, or helpful, to some or all of you. I'm more than eager to welcome comments / ideas /suggestions to make especially the comparison chart better. And I'm delighted to answer any questions anyone may have.

Yard signs, billboards, television. For voters (as opposed to the few who are political junkies to the point that they "drill down" to judicial races) ... all that hoopla is just so much clutter. Focusing on actual qualifications, makes a lot of sense.

Electing a judge who has the broad-based knowledge and skill-set to do a decent job as Chief Judge -- especially if, within a year or two, that unglamorous task unsurprisingly might wind up getting assigned to the most recently-elected person -- certainly is an important factor to consider.

2. We all know that a serious problem exists with judicial bullying on the Muskegon County Probate Court, along with a pronounced skills deficit, trouble actually following the published procedural rules, and difficulty actually adhering to the Rule of Law. Of course, getting these issues addressed does -- as some in the Prosecutor's Office have reminded me -- run the risk of interpersonal conflict. Because the bully will escalate if the perception of being threatened exists. But conflict is not a necessary consequence, and it is helpful to have someone in the other judicial role with the strength and discipline not to appease or cave in to the bully (which only invites more of the same), but to take assertive and appropriate, diplomatic action, to set boundaries on the bully's behavior.

I can understand why some of the other candidates may not want to speak up about the 800-lb Silverback Alpha Male in the middle of the Probate Court. They are each considerably less free to walk away and refuse to have anything to do with this court if the bullying problem is not fixed. But that's precisely the reason why you need a willing reform candidate, and not someone who already has succumbed to the courthouse equivalent of Stockholm Syndrome, to be able to make things better.

I'll confess, when I needed a record to be made for appellate purposes, of a hearing in front of Judge Pittman, and I wanted to keep him as pacified and docile as possible (which still was about as docile as a Donald Trump rally), I chose ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ and ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ to do the talking. But the real objective ought to be making certain that the law is followed and the public interest is well-served, not presupposing that we must forever walk on eggshells in probate court to avoid the wrath of the bully.

When I was a kid, I remember the inspiration of the Shao-Lin monk (nickname, grasshopper) or the heroes in many western films (say, the Kurosawa-inspired Magnificent Seven). It is always worth remembering that standing up to a bully is far different from being one. The difference matters. And who among our five candidates has the skill set to stand up to the bully, and to make real change, without giving in?

3. The Bench / Bar Committee of the Muskegon County Bar Association -- which the judges themselves largely ignore and treat as a nuisance -- tried announcing at the Annual Meeting this summer, the idea of interviewing judicial candidates and purporting to offer opinions on judicial qualifications.

The proposal was not well-received. And it certainly was not approved by any vote of those attending, or even put forward for a vote.

Indeed, I was the only one in the entire room applauding (and sincerely so, at least for the idea itself) when the County Bar was reminded of Canon One of the Code of Judicial Conduct: "A judge should always be aware that the judicial system is for the benefit of the [people seeking justice in court] and the public, not the judiciary."

While I have given the Muskegon County Bar Association the courtesy of paying dues and attending events, in the time since I returned to Muskegon County, there's a reason why my colleagues such as (but hardly limited to) Messrs. Hughes and Williams routinely chose never even to bother to participate in any bar events. Most of the sitting judges were conspicuously absent from this year's annual meeting.

Without casting aspersions on the Bar Association as a whole, or its members, the so-called Bench-Bar Committee is a joke. And the most laughable aspect of it is Mr. Shafer and the Nolan law firm presuming to offer views on the professionalism, qualifications, and judicial acumen of any of the candidates.

That said, I advised David that I might be willing to participate *if* all interviews were videotaped, and the video was put up on Youtube (I even offered to supply a volunteer videographer), and the panel was not obviously rigged.

Regrettably, under the circumstances, I see no persuasive reason to participate in this charade

I will be sending a short letter, in the near future, declining Mr. Shafer's offer to help the Nolan law firm rig the judicial elections, in an office he shares with one of the candidates.

The voters are smart enough to compare for themselves, if they have something like the attached comparison chart. Muskegon has a few too many dysfunctional dynamics (including a few too many envious, backstabing members, eager to sabotage better-qualified and more ethical lawyers) in its County Bar, for any scheme of "peer review" ever to offer anything remotely resembling reliable information.

ECG